**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Conrad WHITEHEAD, II,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Hector QUESADA,**
**Defendant–Appellant.**

Nos. 87–5093, 87–5120.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 8, 1988.

Decided May 24, 1988.

Rehearing and Rehearing In Banc Denied
July 18, 1988.

---

Stephen Jon Cribari, Deputy Federal Public Defender (Fred Warren Bennett, Federal Public Defender, Beth Farber, Asst. Federal Defender, Baltimore, Md., on brief), for defendant-appellant.

Martin S. Himeles, Jr., Asst. U.S. Atty., Baltimore, Md. (Breckinridge L. Willcox, U.S. Atty., Baltimore, Md., on brief), for plaintiff-appellee.

Before MURNAGHAN and SPROUSE, Circuit Judges, and YOUNG, United States District Judge for the District of Maryland, sitting by designation.

SPROUSE, Circuit Judge:

This is a consolidated appeal by Conrad Whitehead and Hector Quesada from their convictions on narcotics offenses. Whitehead was convicted after a bench trial of possessing more than 500 grams of cocaine with intent to distribute. 21 U.S.C. § 841(a). Quesada pled guilty to importation of more than 500 grams of cocaine. 21 U.S.C. § 952(a) (Supp.1984). Both were sentenced to mandatory five-year terms of imprisonment followed by periods of supervised release pursuant to the Narcotics Penalties and Enforcement Act of 1986 and the Controlled Substances Import and Export Act Penalties Enhancement Act of 1986 (the Acts). 21 U.S.C.A. §§ 841(b)(1)(B), 960(b)(2) (West Supp.1987).[1]

Whitehead contends that the district court erred in its refusal to suppress evidence of the seizure of his cocaine by the government. The contraband was seized following an allegedly unconstitutional dog sniff of Whitehead's luggage in a passenger-train sleeping compartment. Whitehead maintains that the fourth amendment required the government to obtain a search warrant, or at the least have probable cause, before it could bring narcotics-trained dogs into the compartment. We disagree, and affirm the district court's conclusion that the dog sniff, supported by reasonable suspicion that the luggage contained contraband, did not violate the fourth amendment.

Quesada and Whitehead challenge the constitutionality of the Acts' minimum sentencing provisions. They argue that the provisions offend fifth amendment guarantees of due process and equal protection and the eighth amendment's prohibition of cruel and unusual punishment. They further assert that the trial court erred in imposing a period of supervised release following their incarceration.[2] We find no merit to the defendants' constitutional arguments, but we vacate their terms of supervised release and remand for the imposition of special parole terms pursuant to 21 U.S.C. §§ 841(b), 960(b) (1982).

I.

A.

The undisputed facts relating to Whitehead's fourth amendment contentions were developed at a suppression hearing before the district court. At approximately 8:30 a.m. on November 26, 1986, ten minutes before the departure of the morning train to New York City, police officers observed a man, later identified as Whitehead, arrive at the Miami, Florida AMTRAK station in a taxi.[3] Emerging from the cab, the officers watched as the man thoroughly scanned the area in front of the station before entering. Then, carrying a sports bag with two tennis rackets partially protruding

---

**1.** The Narcotics Penalties and Enforcement Act of 1986 appears as Subtitle A in Title I of the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, §§ 1001–09, 100 Stat. 3207, 3207–2, 3207–2 to 3207–8 (1986). The Controlled Substances Import and Export Act Penalties Enhancement Act of 1986 appears as Subtitle G in the Anti–Drug Abuse Act of 1986, Pub.L. 99–570, §§ 1301–02, 100 Stat. 3207, 3207–15, 3207–15 to 3207–18 (1986). The Acts' sentencing provisions at issue here are identical in all material aspects.

**2.** Quesada limits his appeal to these sentencing arguments.

**3.** The officers were members of the Metro–Dade County Narcotics Interdiction Unit. They were assigned to the AMTRAK station for the specific purpose of detecting individuals engaged in illegal narcotics activities, and were performing their routine duties when Whitehead came to their attention.

from it and a piece of Samsonite-type luggage, he walked inside and purchased a one-way, first-class sleeping car ticket to New York. He paid $403 in cash for the ticket.[4]

Whitehead's initial scrutiny of the station entrance aroused the police officers' suspicion. It appeared to them that he was checking the area for surveillance. One of the officers questioned the taxi driver and another questioned the ticket agent who sold Whitehead his ticket. The taxi driver said that he picked Whitehead up at the DiLido Hotel. The DiLido is a Miami Beach hotel known to police officers as a common meeting point for drug traffickers. The ticket agent said that Whitehead had verbally identified himself as "W. Tucker" and that his ticket was issued in that name.[5]

Two officers then approached Whitehead as he was walking toward the train platform. They identified themselves, and Whitehead consented to speak with them. When asked his name, Whitehead replied "W. Tucker, just like on the ticket." Although the station was air-conditioned, Whitehead broke into a profuse sweat when the officers asked him for further identification. He showed them a pair of military dog-tags around his neck, but stated that he had no other identification. In response to further questioning, Whitehead said that he was from New York and had been in Miami for two days playing tennis with friends and staying at the DiLido Hotel. The officers then informed Whitehead that they were conducting a narcotics investigation, and they asked permission to look into his luggage. Whitehead declined, and without further interruption from the officers, he boarded the train for New York.

The Miami police called AMTRAK police in Washington to inform them of what had transpired and of their suspicions concerning Whitehead.[6] An AMTRAK officer ran a computer search on the name "W. Tucker" and ascertained that no one by that name had travelled by train from New York to Miami. The officer further found that "W. Tucker" had secured his reservation on the Miami–New York train a few hours before its departure.[7]

On the following morning, the AMTRAK officer boarded Whitehead's train at the Washington station and questioned one of the porters who serviced the train car in which Whitehead was residing. The porter stated that Whitehead became sick early on in the journey, had eaten little, and had ventured out of his roomette only for very short periods of time. The roomette had a sliding inside lock; it could not be locked from the outside.

Other police officers and narcotics-trained dogs boarded the train at the Baltimore station. The AMTRAK officer, posing as a conductor checking tickets, knocked on Whitehead's compartment door.[8] When Whitehead opened the door, the officer identified himself as a policeman and asked Whitehead's permission to enter the compartment. Whitehead said "yes" and invited him in.[9]

4. The cost of a one-way train ticket from Miami to New York was the same as a round-trip ticket, and it was more than a one-way plane ticket.

5. At this point, of course, the officers were unaware of Whitehead's true name.

6. A Miami police officer had telephoned the New York number that Whitehead provided on his ticket application. At the suppression hearing, the officer stated that he tried the number three or four times and received no answer.

7. The officer testified that most vacation travellers make their train reservations well in advance because the Miami–New York route is often filled to capacity. He further stated from his experience in narcotics interdiction that drug couriers prefer train travel because unlike air travel they do not have to check their luggage or pass it through a metal-detection machine. He also noted that drug couriers usually pay cash for their tickets to avoid presenting formal identification.

8. The officer testified that conductors routinely checked passengers' tickets three or four times during the trip from Miami to New York.

9. Whitehead does not dispute that the officer identified himself, displaying his police credentials, and that Whitehead consented to his entry into the compartment.

After stepping inside, the officer informed Whitehead that he was conducting a narcotics investigation, and asked Whitehead for consent to open his luggage, which was visible on the floor of the compartment. Again breaking into a profuse sweat, Whitehead at first declined, but then asked "well, what happens if I don't let you search." The officer responded that he had narcotics-trained dogs readily available to sniff the luggage. Whitehead, in turn, replied "well you go ahead and bring on your dogs."[10] Two dogs were then brought into Whitehead's roomette while he waited outside. They sniffed and alerted on his luggage.[11]

The police detained Whitehead while they obtained a warrant to open his luggage.[12] After securing the warrant, they discovered three kilograms of 86.3 percent pure cocaine in his Samsonite-type bag.

The trial court denied Whitehead's suppression motion. Invoking the rationales underlying the "vehicle exception" to the warrant requirement, *see generally California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), the court held that "[t]he expectation of privacy of one occupying a roomette ... is substantially less than that of a person occupying a temporary home such as a hotel room." Since the officers reasonably suspected Whitehead of criminal wrongdoing, the court determined that their canine investigation of his roomette did not offend the fourth amendment.

We agree with the trial court's mode of analysis and its finding of reasonable suspicion. We conclude that the brief exposure of the interior of a train compartment to narcotics detection dogs is constitutionally permissible when based on a reasonable, articulable suspicion that luggage within the compartment contains contraband.

### B.

■ Whitehead on appeal concedes, as he must, that the exposure of luggage located in a public place to a trained canine is not a "search" for fourth amendment purposes.[13] *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). He contends, however, that his luggage was not located in a "public place," but in a train compartment that was the functional equivalent of a temporary home similar to a hotel room. *See Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893–94, 11 L.Ed.2d 856 (1964) (according full fourth amendment protection to hotel room guests). Based on this reasoning, he argues that the police could not bring their trained canines into his compartment without a warrant, or at the least, probable cause. We disagree. Like the trial court, we reject the contention that a passenger train sleeping compartment is a "temporary home" for fourth amendment purposes. While occupants of train roomettes may properly expect some degree of privacy, it is less than the reasonable expectations that individuals rightfully possess in their homes or their hotel rooms.

### i.

In determining the legitimacy or "reasonableness" of a claimed privacy interest, the Supreme Court has given weight to the

---

**10.** At the suppression hearing, the officer testified that Whitehead's reply was "well, bring on the dogs." In his briefing to the district court, however, Whitehead admitted that he responded "well you go ahead and bring on your dogs." The differences are not material, however, since the trial court made no finding that Whitehead consented to the dogs' entry into his compartment. *See infra* note 15.

**11.** One of the dogs alerted on only one piece of luggage, while the other alerted on both. There is no indication that the police officers moved any of Whitehead's effects or that they looked into any area of the compartment that was not in plain view.

**12.** At no time prior to the dog sniff did the police officers restrain Whitehead's movement or indicate by words or conduct that he was not free to leave. Although Whitehead argues that the police detained him when they first entered his roomette, this contention is entirely without evidentiary support.

**13.** He further admits that if the dog-sniff of his luggage was within constitutional bounds, then its result gave the officers probable cause to detain him and to obtain a warrant to search his luggage.

"intention of the Framers of the Fourth Amendment, *e.g., United States v. Chadwick,* 433 U.S. 1, 7–8, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977), the uses to which the individual has put a location, *e.g., Jones v. United States,* 362 U.S. 257, 265, 80 S.Ct. 725, 733, 4 L.Ed.2d 697 (1960), and our societal understanding that certain areas deserve the most scrupulous protection from government invasion, *e.g., Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)." *Oliver v. United States,* 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984); *see also Rakas v. Illinois,* 439 U.S. 128, 143–44, n. 12, 99 S.Ct. 421, 430–31, n. 12, 58 L.Ed.2d 387 (1978) ("Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."). These factors are equally relevant to determining the dimensions of Whitehead's privacy interest in his train compartment.[14]

"[S]ince the beginning of the government," courts have recognized "a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon, or automobile for contraband goods." *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). And, over the course of sixty years since *Carroll* was decided, the Supreme Court has consistently reaffirmed that the privacy interests of individuals engaged in transit on public thoroughfares are substantially less than those that attach to fixed dwellings. *See, e.g., Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *California v. Carney,* 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed. 2d 406 (1985); *see also South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976).

The diminished privacy aspects of public transportation result in part from the law enforcement exigency created by ready mobility and its potential for immediate flight from the jurisdiction, *Ross,* 456 U.S. at 806–07, 102 S.Ct. at 2163, as well as from the web of governmental regulation that surrounds most forms of transportation. *See Carney,* 471 U.S. at 392, 105 S.Ct. at 2069–70; *Cady v. Dombrowski,* 413 U.S. 433, 440–41, 93 S.Ct. 2523, 2527–28, 37 L.Ed.2d 706 (1973). Recently, in *Carney,* the Supreme Court held that the search of a parked motor home in a public place fell within the ambit of the "automobile" or "vehicle" exception to the warrant requirement. 471 U.S. at 390–93, 105 S.Ct. at 1068–70. The Court reasoned that the governmental interest in preserving safe and efficient modes of public transportation "necessarily lead[s] to reduced expectations of privacy." *Id.* at 392, 105 S.Ct. at 2070. Because the motor home at issue was both readily mobile and subject to a range of governmental regulation inapplicable to fixed dwellings, "the overriding societal interests in effective law enforcement justif[ied] an immediate search before the vehicle and its occupants bec[a]me unavailable." *Id.* at 393, 105 S.Ct. at 2070.

These established fourth amendment principles provide a helpful clarification of Whitehead's privacy interests in his train compartment. Unlike the parked motor home in *Carney,* Whitehead's roomette was moving swiftly in interstate transit. Whitehead's status therein was that of a passenger, not a resident. Although Whitehead had no ability to direct the train's movement, its continuing journey imposed practical constraints on the officers' ability to mount a full-fledged investigation within jurisdictional boundaries. Moreover, Whitehead could leave the train at any stop, and unlike a hotel guest, he had no authority to remain on the train once it reached its destination.

**14.** *See O'Connor v. Ortega,* 480 U.S. 709, ——, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714, 722 (1987) (plurality op.) ("Because the reasonableness of an expectation of privacy, as well as the appropriate standard for a search, is understood to differ according to context, it is essential first to delineate the boundaries of the [area searched].").

Railroad travel is also a highly regulated form of transportation. Not only are railroads subject to a plethora of federal licensing, inspection, safety, and operating standards, *see, e.g.,* 49 C.F.R. §§ 209–36, they owe extremely high duties of care to their passengers and their employees, both under the common law, *Pennsylvania Co. v. Roy,* 102 U.S. (12 Otto) 451, 456, 26 L.Ed. 141 (1880), and under federal statutory law, *see, e.g., Gallick v. Baltimore & Ohio R.R. Co.,* 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963) (affirming jury verdict holding railroad liable under Federal Employers' Liability Act, 45 U.S.C. § 51, for an insect bite). These operating regulations and standards of care are commonly reflected in administrative and safety rules applicable to all individuals who elect to travel by rail. Passengers in sleeping cars are repeatedly subject to inquiry and oversight by conductors and other railroad personnel. *United States v. Liberto,* 660 F.Supp. 889, 891 (D.D.C.1987), *aff'd,* 838 F.2d 571 (D.C. Cir.1988). Intrusions such as these necessarily reduce privacy interests from what they would be had the passengers elected to stay at home.

In light of these factors, we cannot say that Whitehead enjoyed the same quantum of privacy in this highly mobile means of public transportation as he would in his home or hotel room. *See id.* (privacy expectation of passenger in train sleeping compartment "is not akin to that of a person in his home"). In addition to the variety of rules of conduct and safe passage applicable to trains and their passengers, Whitehead was required on at least three or four occasions to open his compartment for routine ticket checks. He showed no reluctance to open the door again for the AMTRAK officer for what purportedly was another routine check. The porter servicing Whitehead's car was sufficiently cognizant of Whitehead's activities to report to the AMTRAK officer that he had become sick, had eaten little, and had ventured from his roomette only for short periods of time. Finally, the riding public and train employees alike enjoyed ready access to Whitehead's tiny compartment if he stepped out or did not engage the inside sliding lock. *Cf. Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed. 2d 325 (1974) (configuration of vehicle contributed to lower expectation of privacy). In summary, all of these factors compel us to reject Whitehead's contention that his roomette was the functional equivalent of a hotel room. Sleeping compartments simply are not homes on rails.

ii.

■ Whitehead next contends that even if his expectation of privacy was no greater than that of an automobile occupant, the fourth amendment required the police to have more than a reasonable suspicion before they could bring their trained dogs into his compartment. He argues that probable cause must have supported the entry.[15] Again, we disagree. Given Whitehead's reduced expectation of privacy in the roomette, the importance of the law enforcement interests at stake, and the minimal intrusiveness of the dog sniff, we conclude that probable cause was not a prerequisite for the dog sniff.

The fourth amendment, of course, does not protect people from *every* governmental intrusion into their legitimate expectations of privacy, only from "unreasonable" ones. *Place,* 462 U.S. at 706–07, 103 S.Ct. at 2644 (quoting *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977)). In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "the Court recognized the narrow authority of police officers who suspect criminal activity to make limited intrusions on an indi-

---

**15.** In light of the undisputed evidence, we have no doubt that Whitehead consented to the initial entry of the AMTRAK officer into his compartment. We cannot construe his later statement —"bring on the dogs," however, as consent to the ensuing dog sniff. According to the testimony at the suppression hearing, the AMTRAK officer informed Whitehead that the dogs were available to sniff his luggage. Under these circumstances, Whitehead may well have believed that the dog sniff was an inevitable consequence of his refusal to grant the officer's search request. Whitehead's statement therefore could easily be construed as reluctant acquiescence to an otherwise certain outcome.

vidual's personal security based on less than probable cause." *Michigan v. Summers,* 452 U.S. 692, 698, 101 S.Ct. 2587, 2592, 69 L.Ed.2d 340 (1981). The Court based its decision in *Terry* on "the ultimate standard of reasonableness embodied in the Fourth Amendment," *Summers,* 452 U.S. at 699–700, 101 S.Ct. at 2593, and subsequent decisions have demonstrated that the exception for limited intrusions is not confined to the "stop and frisk" situation presented in *Terry. Id.* at 700, 101 S.Ct. at 2593; *see, e.g., United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985); *Place,* 462 U.S. at 706, 103 S.Ct. at 2644; *United States v. Brignoni–Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 2579–80, 45 L.Ed.2d 607 (1975). Any departure from the probable-cause requirement, however, "rests on a balancing of the ... nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Place,* 462 U.S. at 703, 103 S.Ct. at 2642.[16] Striking that balance here, we conclude that the officers' entry into Whitehead's compartment to conduct a dog sniff was reasonable without a showing of probable cause.

We have already discussed the limited quantum of privacy that Whitehead reasonably could expect while in transit on the AMTRAK train. We must also consider both the intrusiveness of the dog sniff and the gravity of the law enforcement interests that supported it. The Supreme Court's opinion in *Place* is instructive on both questions.

In *Place,* the Court concluded that a dog sniff of luggage in a public place is not a "search," *id.* at 707, 103 S.Ct. at 2645,[17] and that a brief seizure of luggage for that purpose does not contravene the fourth amendment if based on an articulable, reasonable suspicion that the luggage contains contraband. *Id.* at 708–09, 103 S.Ct. at 2645.[18] The majority reasoned that it was "aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *Id.* at 707, 103 S.Ct. at 2644–45. In the present case, the authorities conducted the dog sniff of Whitehead's luggage in a similarly unintrusive manner. If in fact the police "seized" Whitehead's luggage at all, it was only for the very short time necessary to bring the dogs inside his compartment. The dogs' presence had been prearranged, the luggage was not moved, the train was not delayed,[19] and by every indication Whitehead remained free to move about in the train while the officers conducted the sniff. In

**16.** *Cf. United States v. Mendenhall,* 446 U.S. 544, 561, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980) (Powell, J., concurring) (plurality opinion) (In determining the reasonableness of an investigatory stop, "the Court has emphasized (1) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and expertise.").

**17.** The Court provided ample support for this conclusion:

A 'canine sniff' by a well-trained narcotics detection dog ... does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which the information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of nar-

cotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

*Id.* 462 U.S. at 707, 103 S.Ct. at 2644.

**18.** The Court held that "the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause." *Id.* at 709, 103 S.Ct. at 2645; *see United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (20 minute investigatory stop held not unreasonable).

**19.** Whitehead stipulated to the trial court that the train was stopped at the Baltimore station for thirteen minutes. The period in which the dogs were present in his roomette obviously was less than that.

summary, the brief entry of the dogs into the roomette did not breach the security of Whitehead's effects or entail a significant encroachment on his privacy.

We next consider the gravity of the law enforcement interest supporting the canine sniff. In this context, the test for justifying an intrusion on fourth amendment interests in the absence of probable cause is whether the governmental interests are "sufficiently 'substantial.' " *Id.* at 704, 103 S.Ct. at 2643 (quoting *Michigan v. Summers,* 452 U.S. 692, 699, 101 S.Ct. 2587, 2592, 69 L.Ed.2d 340 (1981)). In *Place,* the Court identified "prevent[ing] the flow of narcotics into distribution channels" by allowing investigative stops of suspected drug couriers as a "strong governmental interest." *Id.* 462 U.S. at 704–05, 103 S.Ct. at 2643. This echoed previously expressed concerns over the law-enforcement obstacles that modern drug trafficking methods present, *United States v. Mendenhall,* 446 U.S. at 561–62, 100 S.Ct. at 1881 (1980) (Powell, J., concurring) (plurality opinion),[20] and "[t]he special need for flexibility in uncovering illicit drug couriers," *Florida v. Royer,* 460 U.S. 491, 519, 103 S.Ct. 1319, 1335, 75 L.Ed.2d 229 (1983) (Blackmun, J., dissenting).

The facts of this case likewise involve the "sufficiently substantial" law enforcement interest of interdicting narcotics moving in transit between source and distribution cities. Although the importance of this interest does not hasten a retreat from the Constitution, it plays a role in the calculation of "reasonableness" under the fourth amendment.[21] Therefore, in light of the officers' suspicions of Whitehead, the discreet and unintrusive manner in which they verified them, and Whitehead's limited privacy interest in his roomette, we conclude that the dog sniff at issue did not require a showing of probable cause.[22]

### iii.

■ In his final argument in support of excluding the cocaine, Whitehead contends under the principles of *Terry* that the fourth amendment required the officers to have an articulable, reasonable suspicion that his luggage contained contraband, and that they did not possess such a suspicion. The district court agreed that reasonable suspicion was necessary before the officers could conduct a dog sniff inside Whitehead's compartment, but it concluded that numerous objective factors regarding Whitehead's appearance and conduct provided the officers with the requisite quantum of suspicion. We agree with the district court on both accounts.

### a.

*Place* obviously did not sanction the indiscriminate, blanket use of trained dogs in all contexts. *See United States v. Beale,*

---

**20.** As Justice Powell stated for a plurality of three in *Mendenhall,* "[t]he public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit." 446 U.S. at 561, 100 S.Ct. at 1881.

**21.** As Justice White observed in his concurring opinion in *Dunaway v. New York, Terry* is not "an almost unique exception to a hard-and-fast standard of probable cause," rather, "the key principle of the Fourth Amendment is reasonableness—the balancing of competing interests." 442 U.S. 200, 219, 99 S.Ct. 2248, 2260, 60 L.Ed. 2d 824 (1979) (White, J., concurring); *accord Summers,* 452 U.S. at 700 n. 12, 101 S.Ct. at 2593 n. 12.

**22.** Although there are scores of reported state and federal cases involving dog sniffs, neither the parties' nor our own research has revealed a case that is factually on point with the present case. Perhaps closest, is *United States v. Liber-*

to, 660 F.Supp. 889 (D.D.C. 1987), *aff'd,* 838 F.2d 571 (D.C.Cir.1988). In that case a narcotics dog sniffing in a public passageway outside the defendant's train compartment lunged into his roomette and sniffed in the direction of a suitcase located on a rack above the floor. The district court held that the lunge was not a "search" under the fourth amendment. *Id.* at 891; *see United States v. Quinn,* 815 F.2d 153, 159 (1st Cir.1987) (upholding dog sniff inside defendant's automobile on showing of reasonable suspicion, unclear whether defendant consented to dog's intrusion); *but cf. United States v. Thomas,* 757 F.2d 1359 (2d Cir.1985), (dog sniff in corridor outside residential apartment is a search requiring probable cause and a warrant), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1986); *see generally United States v. Dicesare,* 765 F.2d 890, 901–03 (9th Cir.1985) (Reinhardt, J., concurring) (opining that dogs are potentially more intrusive than police officers when used to sniff inside homes).

736 F.2d 1289, 1291 (9th Cir.) (en banc) cert. denied, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); 1 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* 2.2(f) at 373 (2d ed. 1987). As we have indicated, when authorities bring a narcotics detection dog into an area in which the occupant enjoys an expectation of privacy, the fourth amendment extends to protect the owner against "unreasonable" intrusions. Here, however, Whitehead enjoyed only a diminished expectation of privacy, and we are persuaded under the facts of this case that the reasonable suspicion standard of *Terry* and its progeny satisfied the fourth amendment's "reasonableness" mandate.

### b.

The district court listed numerous objective facts, which considered together with the officers' experience, reasonably aroused their suspicions of Whitehead: (1) Whitehead was travelling from Miami, a major source city for cocaine and other narcotics; (2) he had stayed at the DiLido Hotel, an establishment known to the officers as a meeting place for drug traffickers; (3) Whitehead arrived at the AMTRAK station just minutes before the train's departure, and rather than proceeding immediately to the ticket counter, he repeatedly looked around the entrance of the station before going inside; (4) after allegedly vacationing in Miami for only two days, Whitehead elected to take a twenty-six hour train trip home, at a cost substantially higher than the price of an airline ticket; (5) Whitehead had not taken the train to Miami, at least not under the name "W. Tucker;" (6) when twice asked his name, Whitehead replied "W. Tucker" rather than supplying a full name; (7) he had made his train reservation just hours before its departure, a fact inconsistent with most vacation train travellers; (8) one reasonable explanation for Whitehead's return by train was to avoid airport security and baggage checks; (9) Whitehead paid for his $403 ticket in cash, thus avoiding the need to present identification; (10) although dressed like a businessman, Whitehead had no identification other than military dog tags; (11) Whitehead appeared startled, nervous, and began sweating profusely on both occasions when he was approached by police officers; and (12) during the course of the journey, Whitehead left his compartment only for very short periods of time. The AMTRAK officer testified from his drug interdiction experience that narcotics couriers prefer to remain with their baggage at all times.

We are satisfied that the officers reasonably suspected that Whitehead was engaged in the transport of narcotics. *Cf. United States v. Alpert*, 816 F.2d 958, 960–61 (4th Cir.1987); *United States v. Corbin*, 662 F.2d 1066, 1069–70 (4th Cir.1981). Contrary to Whitehead's argument, we cannot engage in piecemeal refutation of each individual factor as being consistent with innocence.[23] It is the entire mosaic that counts, not single tiles. We affirm the denial of Whitehead's suppression motion.

### II.

Whitehead and Quesada advance identical constitutional challenges to their sentences under the Narcotics Penalties and Enforcement Act of 1986 and the Controlled Substances Import and Export Act Penalties Enhancement Act of 1986. 21 U.S.C.A. §§ 841(b)(1)(B), 960(b)(2) (West. Supp.1987). Whitehead was found to have possessed more than three kilograms of 86.3 percent pure cocaine. Quesada pled guilty to importing approximately two kilograms of 84–87 percent pure cocaine. Both were sentenced to five years mandatory imprisonment—the lightest sentence the Acts permit for their crimes.

The challenged sentencing provision in the Narcotics Penalties and Enforcement Act provides in pertinent part:

---

**23.** Both parties devote a great deal of their briefing to whether the officers relied exclusively on the so called "drug courier profile." While the profile may be helpful in some situations, as the Eleventh Circuit has stated, "it detracts from the proper test under *Place* and *Terry*: whether specific, articulable facts *in this case,* considered on the totality of the circumstances, indicate reasonable suspicion." *United States v. Puqlisi,* 723 F.2d 779, 789 n. 16 (11th Cir.1984).

(B) In the case of a violation of subsection (a) of this section involving—
(ii) 500 grams or more of a mixture containing a detectable amount of—

. . . . .

    (II) cocaine ...

. . . . .

[such] person shall be sentenced to a term of imprisonment [which may not be] less than 5 years and not more than 40 years. ... Any sentence imposed under this [sub]paragraph shall, in the absence of such a prior conviction, include a term of supervised release of at least 4 years in addition to such term of imprisonment. ... Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this [sub]paragraph. No person sentenced under this [sub]paragraph shall be eligible for parole during the term of imprisonment imposed therein.
21 U.S.C.A. § 841(b)(1)(B) (West Supp. 1987).[24]

█ In their first argument, Whitehead and Quesada contend without supporting authority that the Acts' classification of punishment by quantity of contraband without regard to its purity or the role of the offender is arbitrary and without a rational basis and therefore violative of the fifth amendment's due process clause and its equal protection component.

"[T]he test of equal protection validity regarding this type of legislation is 'wheth-er the classifications drawn in [the] statute are reasonable in light of its purpose.' " *United States v. Richards,* 737 F.2d 1307, 1310 (4th Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985) (quoting *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964)). "A court does not concern itself as to whether the legislature made a correct judgment, but only whether it made a rational one. In other words, the test of constitutional validity is whether the legislature rationally could have decided that the classification would further the statutory purpose." *Richards,* 737 F.2d at 1310.

The legislative history of the Narcotics Penalties and Enforcement Act indicates that Congress was aware that its sentencing provisions did not focus on "the number of doses of the drug that might be present in a given sample." H.R.Rep. No. 845, 99th Cong., 2d Sess., pt. 1, at 12 (1986) (Report of the House Committee of the Judiciary). Rather, Congress chose a "market-oriented approach" to concentrate on those persons "responsible for creating and delivering very large quantities of drugs," including "trafficker(s) in a high place in the processing and distribution chain" and the "managers of the retail level traffic" selling "substantial street quantities." *Id.* at 11–12.[25] There is no doubt then concerning congressional intent and we conclude that Congress' approach of classifying punishment in relation to the

---

24. Bracketed words in the block reflect immaterial differences that appear in the coordinate sentencing provision of the Controlled Substances Import and Export Act Penalties Enhancement Act of 1986, 21 U.S.C.A. § 960(b)(2) West Supp.1987).

25. Senator Byrd commented extensively on the penalty provisions of the Acts:

"The language I originally proposed has been included in the penalty section of this bipartisan bill which will require that for certain crimes involving drugs, the convicted defendant must —I repeat must—be sentenced to the penitentiary. He must serve jail time. He will know that in advance because it will be the law. It will not be a matter of the judge's discretion for these types of crimes. It will be a requirement imposed by law on the sentencing judge.

    . . . .

This approach will be applied to all the major drug dealers who are preying upon our society ... We divide these major drug dealers into two groups for purposes of fixing what their required jail terms shall be:

For the kingpins—the masterminds who are really running these operations—and they can be identified by the amount of drugs with which they are involved—we require a jail term upon conviction. ...

Our proposal would also provide mandatory minimum penalties for the middle-level dealers as well. Those criminals would also have to serve time in jail. The minimum sentences would be slightly less than those for the kingpins, but they nevertheless would have to go to jail—a minimum of 5 years for the first offense. ..."
132 Cong.Rec. S14270–01 (Sept. 30, 1986).

quantity of substances containing narcotics rather than to their purity is rationally related to its goal of sentencing criminals involved in the upper echelons of drug distribution more heavily than those less importantly involved.[26]

■ Both Whitehead and Quesada also contend that the Acts' minimum mandatory sentencing schemes violate the eighth amendment's proscription of cruel and unusual punishment. They rely on the Supreme Court's decision in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) and urge that the Acts' penalties are disproportionately harsh in light of the gravity of the crimes for which they were convicted. The short answer to this contention is contained in our holdings that *Solem* does not require a proportionality review of any sentence less than life imprisonment without possibility of parole. *United States v. Rhodes*, 779 F.2d 1019, 1027–28 (4th Cir.1985), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986); *see United States v. Guglielmi*, 819 F.2d 451, 457 (4th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988). Even absent these decisions, the defendants' arguments are of no avail. Trial courts are vested with broad discretion in sentencing and, if a sentence is within statutory limits, it will not be reviewed absent extraordinary circumstances. *See United States v. Tucker*, 404 U.S. 443, 446–47, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1982).

■ In their final argument, Whitehead and Quesada contend that the district court could not properly impose terms of supervised release under the Acts, because the supervised release provisions did not become effective until November 1, 1987. We agree. As the Fifth Circuit has recently stated, "Title I, Section 1004 of the Anti-Drug Abuse Act of 1986 replaced the term 'special parole term' with 'term of super-

vised release' each place the term appeared in the Controlled Substances Act and the Controlled Substances Import and Export Act. Section 1004 expressly ties the effective date of the amendments to the effective date of 18 U.S.C. § 3583." *United States v. Byrd*, 837 F.2d 179 (5th Cir.1988). Section 3583 did not become effective until November 1, 1987—well after the defendants committed the offenses for which they were sentenced. We agree with the holding in *Byrd* that terms of supervised release may not be imposed under the Anti-Drug Abuse Act of 1986 for offenses committed prior to November 1, 1987.

Accordingly, we affirm the defendants' convictions and their terms of imprisonment, but vacate their terms of supervised release and remand to the district court for imposition of special parole terms pursuant to 21 U.S.C. §§ 841(b), 960(b) (1982).

AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR RESENTENCING.

MURNAGHAN, Circuit Judge, dissenting:

Because I believe that a passenger train sleeping compartment is more analogous to a temporary home than to an automobile for Fourth Amendment purposes, I find that Whitehead's legitimate and reasonable expectation of privacy was violated by the search. I, therefore, respectfully dissent.

I

The Fourth Amendment "protects people from unreasonable Government intrusions into their legitimate expectations of privacy." *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). In order to establish a constitutionally legitimate expectation of privacy, a defendant must demonstrate two conditions: (1) the defendant must have exhibited an actual, subjective expectation of pri-

---

26. Some anomalies in this scheme readily appear. A small amount of pure cocaine, for example, may in bulk be lighter than lessor quality cocaine that is more heavily diluted for street distribution. The rationally related test, however, does not require an exact equation of congressional action to the perfect effectuation of its intent. While there may well be incidenc-

es where the quality of cocaine involved could have an impact on whether the upper echelons of criminal society will be more severely punished, we think that measuring the criminal's punishment by the quantity bulk drug material rationally serves Congress' intent to punish drug traffickers severely.

vacy; and (2) the expectation must be one that the society is prepared to recognize as reasonable. *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

There is no dispute that the subjective prong of the two part *Katz* requirement was satisfied by Whitehead. Indeed, he purchased a ticket to a first class sleeping compartment which entitled him to exclusive use of that compartment. It contained a bed, a sink, and a commode. It could also be locked securely from the inside. The defendant clearly manifested an actual, subjective expectation of privacy.

The primary issue here, therefore, is whether the defendant satisfied the objective prong of the *Katz* requirement. The Supreme Court has held that "[n]o less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964). In order for police officers to search a hotel room, therefore, they must have probable cause and a warrant, except under exigent circumstances. *See id.* at 490, 84 S.Ct. at 893; *United States v. Lyons,* 706 F.2d 321, 326 (D.C. Cir.1983). The majority holds, however, that a defendant in a train sleeping compartment enjoys a diminished expectation of privacy as compared to a defendant in a hotel room. It contends that a sleeping compartment is more like an automobile or a motor home than a hotel room. Therefore, according to the majority's reasoning, Whitehead is entitled to no more expectation of privacy for Fourth Amendment purposes than an occupant in an automobile.

The majority contends that the diminished expectation of privacy in a train compartment arises from the exigency created by ready mobility, *see United States v. Ross,* 456 U.S. 798, 806–07, 102 S.Ct. 2157, 2163, 72 L.Ed.2d 572 (1982), and from the range of governmental regulations, *see California v. Carney,* 471 U.S. 386, 392, 105 S.Ct. 2066, 2069–70, 85 L.Ed.2d 406 (1985). *See also United States v. Liberto,* 660 F.Supp. 889, 891 (D.D.C. 1987), *aff'd without op.,* 838 F.2d 571 (D.C. Cir.1988).

The majority's reliance on those two factors is not persuasive. First, unlike an automobile, motor home or a boat, a suspect has no control over the movement of the train. A train must run on tracks and conform to a schedule set independently of the suspect. Therefore, the whereabouts of the suspect and the contraband remained known to the law enforcement officers. Therefore, it cannot be said that the opportunity to search was fleeting, *see Chambers v. Maloney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970), or that the train "could readily have been moved beyond the reach of the police." *Carney,* 471 U.S. at 393, 105 S.Ct. at 2070. While a train may move in and out of different jurisdictions, since the train route is preset, the government, anticipating arrival and whereabouts, could have applied in advance for a warrant in the jurisdiction through which the train is scheduled to travel. *See United States v. Goff,* 681 F.2d 1238, 1240 (9th Cir.1982). Indeed, the defendant was already under suspicion before he boarded the train in Miami. A federal law enforcement officer did not board the train until the train reached Washington, D.C., and the search was not conducted until the train reached Baltimore. The elapsed time by railroad from Miami to Baltimore was ample to permit application for and issuance of a warrant.

Second, while railroad travel is a highly regulated form of transportation, the regulations are generally aimed towards railroad companies and not their passengers. While such regulations may lessen the expectation that a railroad company may have with regard to safety inspections, it certainly cannot be successfully argued that they lessen the passengers' expectation of privacy. Admittedly, passengers in a sleeping car must purchase a ticket and are subject to certain inquiry and oversight concerning solely the travel aspects of their presence on board by conductors and other railroad personnel. *See Liberto,* 660 F.Supp. at 891. However, the degree of intrusion accompanying routine ticket checks is so minimal that passengers' reasonable expectations of privacy of their persons could not be deemed to have been diminished as is here claimed by the

government. Indeed, routine ticket checks are no more intrusive, in fact less so, than the daily visits by cleaning personnel at a hotel.

The fact that the train compartment could not be locked from the outside is not sufficient to find a diminished expectation of privacy. Because of the adequate accommodations within the compartment, if the defendant had brought his own food or had it delivered, he need not have left the room for any reason until the train had reached the ultimate destination. Moreover, in *Katz*, the phone booth could be locked neither from the inside nor the outside. For the hours that Whitehead was aboard the train, the compartment was his temporary, transitory home and served as the repository of his personal effects. Both the occupant and the contents were not in plain view. *See Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974).

Therefore, the rationales supporting warrantless searches of automobiles are not persuasive as they are applied to sleeping train compartments. Such compartments should be treated, for Fourth Amendment purposes, like a hotel room. A search without probable cause and without a warrant of a train compartment cannot meet the Fourth Amendment constitutional standards. *Cf. United States v. Thomas*, 757 F.2d 1359, 1366–67 (2d Cir.1985) (a dog sniff in the corridor outside a residential apartment is a "search" requiring a warrant based on probable cause), *cert. denied sub nom., Fisher v. United States*, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985). In sum, the canine search of Whitehead's sleeping compartment violated his Fourth Amendment right to be free from unreasonable searches and seizure.

## II

It is well established that an investigative stop, amounting to a Fourth Amendment seizure, must be "supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir.1982) (*quoting Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam)). Even if Whitehead's expectation of privacy in his train compartment were no greater than that of an occupant in an automobile, I disagree with the majority and find that the law enforcement officers did not possess an articulable, reasonable suspicion that the defendant was engaged in trafficking.

The district court listed numerous objective factors that were allegedly sufficient to arouse a reasonable suspicion. While I agree that each individual factor need not directly point to a criminal activity, *see United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir.1987), even when the factors in the instant case are considered together, on the totality of the circumstances, they are not enough to comprise an articulable suspicion. Many of the factors would also describe a large number of presumably innocent persons. Many innocent people, even from New York City, travel to and from Miami and presumably some stay at the DiLido Hotel. Many people dislike or fear flying and, therefore, would prefer to travel by train, regardless of whether it is more time consuming or more expensive than a plane ride. The fact that Whitehead paid with cash does not raise suspicions of ongoing criminal activity. *See United States v. Sokolow*, 808 F.2d 1366, 1371 (9th Cir.1987).

This Court has held that scanning the boarding area and looking "nervous" are not enough to trigger the reasonable suspicion standard. *See United States v. Gooding*, 695 F.2d 78, 83–84 (4th Cir.1982). In addition, at the time of the search, the officers did not know that Whitehead was using an alias. *See Sokolow*, 808 F.2d at 1370 (the search cannot be based on information that is a fruit of the seizure itself). Therefore, the canine search of Whitehead's train compartment cannot be justified under the constitutional requirement of a reasonable and articulable suspicion.

Because Whitehead's conviction was obtained by the use of illegally seized evidence, I would vacate the judgment and remand for a new trial.