**Jeff GRIFFITH**

v.

**W. Samuel TRUETTE, et al.**

**Civ. No. JFM–92–3544.**

United States District Court,
D. Maryland.

Oct. 24, 1994.

Joseph Charles Smith, III, Smith and Smith, Mount Airy, MD, for plaintiff.

Leo W. Ottey, Jr., Office of the Atty. Gen., Columbia, MD, B. Darren Burns, Shapiro and Olander, Annapolis, MD, Paul T. Cuzmanes, Wilson, Elser, Moskowitz, Edelman and Dicker, Baltimore, MD, for defendants.

## MEMORANDUM

MOTZ, District Judge.

Jeff Griffith has brought this action against W. Samuel Truette, A. Donald Grimes, Thomas Bader and Andrew McKendrick. He asserts claims under 42 U.S.C. §§ 1983 and 1985, under Article 24 of the Maryland Declaration of Rights and for various state common law torts. All of the claims arise out of the searches of plaintiff and his car for narcotics on January 11, 1990. Discovery has been completed. Defendants have moved for summary judgment as to all of plaintiff's claims; plaintiff has filed a cross-motion for summary judgment as to his claims under Sections 1983 and 1985 and under the Maryland Declaration of Rights.

## I.

On January 11, 1990, plaintiff was a County Commissioner of Carroll County. Truette was an Assistant State's Attorney for Carroll County; Grimes was a Maryland State Trooper; Bader was a Deputy Sheriff of Carroll County; and McKendrick was an officer of the Westminster Police Department.[1] All of the defendants were also members of the Carroll County Drug Enforcement Coordinating Committee ("DECC"). Jerry Barnes (who is not named as a defendant but who was a conduit of certain information that ultimately lead to the search here in question) was also an Assistant State's Attorney for Carroll County until November 1989 when he resigned and declared his candidacy for the State's Attorney position. Scott Markel, said by Barnes to be one of the sources of his information, was Barnes' campaign manager and a member of the Democratic Central Committee.

Barnes has submitted an affidavit and has testified on deposition that during the late summer or early fall of 1989, while he and Truette were discussing various cases and suspects and exchanging general ideas and information, Truette informed him that he had heard that plaintiff was a drug user. Barnes advised Truette that Barnes' then fiancee (now wife) Carmen Amedori, a newspaper reporter, had covered a convention during the summer of 1989 that plaintiff had attended. According to Barnes, plaintiff told Amedori during the convention that he had used marijuana while driving his car.[2] Barnes further states that on January 7, 1990, during a conversation with Truette, he advised Truette that at a political function held on January 6, 1990, he had been informed by Markel that plaintiff had approached one Steve Powell, an employee of Carroll County, and offered Powell a "joint."

1. Plaintiff also originally named George Butler, a second Maryland State Trooper, as a defendant but has since dismissed his claims against Butler.

2. Amedori has been deposed and has confirmed what Barnes says. She testifies that plaintiff told that he and his girlfriend "had smoked marijua-

na while driving in a little sports car ... and they passed the marijuana cigarette back and forth and that sex was great when you were high." Plaintiff denies that this conversation occurred.

Markel and plaintiff are said by Barnes to be long-standing close friends.

Truette has testified, on deposition and by affidavit, that, in addition to the information that he received from Barnes, he was advised by three confidential sources that they had heard from third parties that plaintiff used marijuana.[3] Based upon the information that he received, Truette directed the police officers who were members of the DECC to investigate plaintiff. On January 11, 1990, Grimes, Bader and McKendrick conducted a surveillance of plaintiff's car as plaintiff drove it from the Carroll County office building to the Westminster Inn, a restaurant with sleeping accommodations. After plaintiff had alighted from his car and gone into the Inn, the officers called for a canine unit. Trained dogs alerted to the scent of drugs in the car, and the officers called in a second unit. The second dog also alerted to the scent of drugs.

That evening McKendrick applied for a warrant to search plaintiff's car and its occupants. The affidavit recited, *inter alia*, information received from two confidential sources, said to be familiar with plaintiff's "employment and certain aspects of his personal life style," that he was currently involved in the use of marijuana. The affidavit also recited the two positive dog alerts that had occurred earlier that day. Based upon the affidavit, a Carroll County Circuit judge issued the warrant.

Bader and Butler (*see* footnote 1, *supra*) executed the warrant that evening. They stopped plaintiff's car after he left the Westminster Inn, patted him down and escorted him to the Westminster Police Department. He was strip searched by McKendrick (but acknowledges that McKendrick did not actually touch him during the search). No drugs were found in plaintiff's possession. Likewise, no drugs were found in plaintiff's car, and no charges were brought against him.[4]

## II.

A reasonable person might well conclude from this evidence that the members of the DECC exercised poor judgment in investigating an alleged marijuana user (albeit one holding public office) on the basis of second-hand information about his life style. That, however, is not what is in issue here.

## A.

■ The question that I must first decide is whether the search of plaintiff's car was conducted pursuant to a duly issued warrant supported by probable cause. The answer to this question is clearly yes. Plaintiff does

---

3. In response to a motion to compel the disclosure of informants, I directed Truette to submit an unredacted affidavit to the court identifying the confidential informants and a redacted form of the affidavit (deleting the names of the informants and information that could easily identify them) to other counsel. I followed this procedure in order to accommodate the conflicting policy interests that the disclosure question raises, reserving the right to compel the disclosure of the identities of the informants to all counsel after reviewing the unredacted affidavit. Having reviewed the affidavit, I am fully satisfied that the informants, in fact, exist. I am further satisfied that, the existence of the informants having been established, there is no other reason to compel the disclosure of their identities to other counsel. Ironically, this is particularly so because of the weakness of what is said in Truette's affidavit. It reflects that the informants had no direct knowledge of plaintiff's alleged marijuana use. Thus, there was no basis for Truette to assess the reliability of the third persons who advised his informants of plaintiff's alleged marijuana use. Under these circumstances, if resolution of the issues in this case depended upon the reliability of the informant information, I would find as a matter of law that the information was unreliable, regardless of the identity and reliability of Truette's immediate informants.

4. Although plaintiff's claims arise from the January 11, 1990 incident, he asserts that two events that occurred after that date demonstrate defendants' bad faith. According to Scott Markel, in April 1990 he was arrested by members of the DECC (allegedly after they had planted a marijuana cigarette and rolling papers in his car) for the purpose of forcing him to cooperate in entrapping plaintiff into engaging in a drug deal or, at least, in setting him up for a DWI charge. Similarly, one Larry Pickett, who allegedly was a confidential informant for various law enforcement agencies, asserts that he was approached by Bader and asked to plant drugs in plaintiff's car. Assuming these facts to be true, the personal motivations of defendants are suspect. However, it is precisely to avoid swearing contests between law enforcement officials and persons whom they investigate that an objective standard of reasonableness in cases such as this is required.

not challenge the formalities of the warrant signed by the Carroll County Circuit Judge, and the positive dog alerts themselves established probable cause for the search of the vehicle.

### B.

■ The next question (although not separately briefed by the parties) appears to me somewhat more difficult: whether the search of plaintiff's person by McKendrick was supported by probable cause. The mere fact that drugs may have been present in a vehicle does not mean that the occupants of the vehicle have drugs on their person. However, since the Carroll County Circuit Judge found that probable cause did exist and did issue the warrant, I find that the search conducted pursuant to the warrant was not unconstitutional under either federal or Maryland law. Moreover, at least as to plaintiff's federal constitutional claim, McKendrick is entitled to the defense of qualified immunity. *See, e.g. Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *United States v. McGriff,* 678 F.Supp. 1010 (E.D.N.Y.1988). I also note as an ancillary matter that plaintiff cannot withstand summary judgment as to his state common law claims since the record does not establish that McKendrick harbored any malice toward plaintiff as would be necessary to defeat "public official immunity" under Maryland law. *See, e.g., Leese v. Baltimore County,* 64 Md.App. 442, 479, 497 A.2d 159 (1985). Moreover, plaintiff's battery claim fails as a matter of law since he acknowledges that McKendrick did not touch him during the search.[5]

### C.

■ Plaintiff has also asserted common law claims for "Unreasonable Publicity to Private Life" and "False Light." Defendants are entitled to summary judgment as to these claims for the simple reason that the summary judgment record does not establish

that they (or any of them) were responsible for generating publicity about this incident. Furthermore, again the record does not establish that any of them acted with actual malice against him.

### D.

■ Plaintiff's final claim is asserted under 42 U.S.C. § 1985 for conspiracy to violate his civil rights. This claim raises what is the most intriguing legal issue in the case: What level of information must a law enforcement official possess before targeting a vehicle to be the subject of a dog sniff? If defendants wrongfully schemed to have an illegal dog sniff conducted in order to obtain a warrant based upon it, arguably they could be found to have engaged in a conspiracy to deprive plaintiff of his constitutional rights even if the resulting search (having been based upon a duly issued warrant based upon probable cause established by the positive dog sniffs) was lawful.

■ Clearly, probable cause is not required for a dog sniff since it is well established that having a dog sniff a vehicle in a public place does not itself constitute a search. *See, e.g., United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983); *United States v. Jeffus,* 22 F.3d 554, 557 (4th Cir.1994). However several circuit court opinions can be read as requiring that law enforcement officials have reasonable and articulable suspicion before having a dog sniff conducted. *See, e.g., United States v. Stone,* 866 F.2d 359, 363 (10th Cir.1989); *United States v. Hardy,* 855 F.2d 753, 759 (11th Cir.1988).

Although the standard established by these cases is an appealing one, it is not necessarily applicable here. Most cases involving dog sniffs arise in a context where an individual, a vehicle or a piece of luggage was interrupted in transit. Here, plaintiff's car was neither physically stopped nor temporarily detained. It was parked in a public place when the dog sniffs were conducted, and plaintiff did not arrive on the scene and

---

5. I might note that if I am erroneous in my conclusion that plaintiff's state law claims based upon the search of his person are barred, I would exercise my discretion not to exercise supplemental jurisdiction over those claims. They raise complex issues of State law; they substan-

tially predominate over the federal claims; and I am dismissing all of the federal claims. *See* 28 U.S.C. § 1367(c). Although what occurred in this case may be unseemly, the issues are of a local nature and should be resolved locally.

seek to move his car before the sniffs were completed.[6]

Plaintiff relies heavily upon *United States v. Whitehead,* 849 F.2d 849, 856–57 (4th Cir. 1988), as standing for the proposition that in the Fourth Circuit reasonable and articulable suspicion is (and in 1990 was) necessary to conduct a dog sniff. In *Whitehead* law enforcement officers brought dogs onto an Amtrak train and into defendant's compartment for the purpose of sniffing defendant's luggage. The luggage was not moved, and the train was not delayed. The district court ruled that the officers needed reasonable suspicion for conducting the dog sniff but further found that the information known to the police provided them with the requisite quantum of suspicion. The Fourth Circuit stated that it "agree[d] with the district court on both accounts." 849 F.2d at 857.

*Whitehead* is distinguishable from the instant case in one critical respect: there the dogs were brought inside defendant's train compartment where, as the court emphasized, defendant "enjoy[ed] an expectation of privacy." *Id.* at 858. Here, having parked and left his car in a public place, plaintiff had no such expectation.[7]

The Fourth Circuit might well extend *Whitehead* to apply to the facts of the present case. This is not, however, a criminal case in which Griffith is seeking to suppress the fruits of what he claims to have been an illegal search. Rather, it is a civil action in which defendants are entitled to the defense of qualified immunity unless they violated one of the Griffith's clearly established constitutional rights. Since even now reasonable lawyers and judges can disagree as to the applicability of *Whitehead*'s holding here, it follows that defendants cannot be held to have known the scope of its dictate on January 11, 1990.

For these reasons defendants are entitled to the summary judgment that they seek. A separate order effecting the rulings made in this memorandum is being entered herewith.

## ORDER

For the reasons stated in the memorandum entered herein, it is, this 24th day of October 1994

ORDERED

1. Plaintiff's motion for summary judgment is denied;

2. Defendants' motions for summary judgment are granted; and

3. Judgment is entered in favor of defendants against plaintiff.

6. Because of the absence of any stop and detention whatsoever, it is arguable that no "seizure" within the meaning of the Fourth Amendment occurred at all. *Compare Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). If that is so, the conducting of a dog sniff without more may not even fall within the purview of the Constitution. This is not to say that as a matter of public policy the indiscriminate targeting of individuals as subjects for dog sniffs should not be prohibited. However, absent a Constitutional violation, such a prohibition

cannot be effected by courts, but only by Congress and the State legislatures acting within their respective spheres of authority.

7. The fact that in *Whitehead* the officers brought the dogs into the defendant's compartment without his consent might also have constituted a technical trespass sufficient to meet the seizure requirement. *See* footnote 6, *supra.* Here, there is nothing in the record to suggest that the officers opened the doors to plaintiff's car or otherwise touched it.