**The UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ronnie Eugene MORIN, Defendant–
Appellant.**

No. 90–2277.

United States Court of Appeals,
Tenth Circuit.

Nov. 8, 1991.

Presiliano Torrez (William L. Lutz, U.S. Atty., and Tara C. Neda, Asst. U.S. Atty., on the brief), Albuquerque, N.M., for plaintiff-appellee.

Penni Adrian, Albuquerque, N.M., for defendant-appellant.

Before BALDOCK, EBEL, and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

Ronnie Eugene Morin was charged in a one-count indictment with unlawfully possessing less than fifty kilograms of marijuana, a Schedule I controlled substance, with an intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(D). Prior to trial, Morin moved to suppress the use at trial of the marijuana taken from him and also moved to suppress the use at trial of any statements made by him to the arresting officers. After an evidentiary hearing, the district court denied that motion. Morin then entered a conditional plea of guilty, reserving his right to have appellate review of the district court's order denying his motion to suppress. Fed.R.Crim.P. 11(a)(2). Morin was thereafter sentenced to twenty-four months imprisonment to be followed by three years of supervised release. Morin appeals therefrom.

At the evidentiary hearing on Morin's motion to suppress, the government called one witness, James Richard Sheridan, Jr., an officer with the Albuquerque, New Mexico Police Department. Morin did not testify at the hearing, nor did he call any witness in his behalf.

Sheridan testified that he was a "narcotics detective" and that his current assignment was to "work public transportation," including "train terminals," looking for drug violations. He stated that a fellow police officer told him that he had received a tip from an anonymous informant that a person had boarded an Amtrak train in Flagstaff, Arizona, bound for Boston, Massachusetts, who "may be carrying narcotics."

More specifically, the informant told Sheridan's fellow officer that the individual in question was a 5'10" white male, weighing around 200 pounds, that he was balding, and wearing a brownish-gray T-shirt with an "8th Street Tavern" logo on the back of the shirt. The informant further stated that this person had purchased a one-way ticket to Boston with cash, and that he personally carried onto the train three bags, "nylon-type soft side," one blue-green, one black and one burgundy color.

Sheridan testified that he and a different fellow officer "met" the Amtrak train when it came through Albuquerque en route to Boston, looking for a person who fit the description given by the informant. Sheridan stated that he and his fellow officer were on the train when they espied an individual standing on the station platform who fit the description, logo and all. The individual was looking at some jewelry, which was being sold on the platform by local vendors, and was also "scanning" the crowd. The individual thus observed boarded the train and proceeded towards a compartment on the lower level, which the officers thought to be "abnormal to most single travelers."[1] Based, then, on the fact that the individual fit the description given by the informant, plus the fact that the individual seemed to be "scanning" the crowd on the station platform, coupled with the additional fact that he was seated in an area on the train where single passengers generally would not be seated, Sheridan testified that he thought he had enough "probable cause" to at least ask the individual if he was carrying any narcotics.

The individual thus observed was Morin. As the train pulled out of the Albuquerque station, Officer Sheridan, in the vestibule area outside the lower compartment, engaged in conversation with Morin. First, Sheridan identified himself and showed Morin his badge and then asked if he could see

---

1. Officer Sheridan stated that the passenger coach had a lower level consisting of compartments, where families and handicapped persons generally sat, and an upper level, where singles generally sat.

Morin's ticket. Morin exhibited his ticket with his name on it. Sheridan then asked for some identification, and Morin produced a copy of his birth certificate. The information on Morin's certificate matched the information on his Amtrak ticket and both were returned to him.

Sheridan next informed Morin that he had received a tip that Morin might be carrying contraband. Morin showed Sheridan where he was seated, and Sheridan then asked if he was carrying any baggage. Morin pointed to a burgundy colored bag on an overhead rack above his seat. Sheridan asked Morin if he could search the bag, and, according to Sheridan, Morin consented. Sheridan's fellow officer entered the compartment occupied by Morin and retrieved the burgundy colored bag. He also informed Sheridan that he had detected an odor of marijuana emanating from somewhere near the doorway to the compartment.

A search of the burgundy colored bag revealed no contraband. Prompted by his fellow officers' report of the odor of marijuana near the doorway to the compartment, Sheridan entered the compartment, where, just inside, was a luggage rack on which were two soft-side nylon bags, one a blue-green color and the other black, and an army duffel bag, which bore an identification tag. There was no identification tag on either of the nylon bags. Sheridan stated that he, too, detected a strong odor of marijuana. He first picked up the duffel bag, and after squeezing and smelling it determined there was no marijuana in the bag. Officer Sheridan was informed that the duffel bag belonged to a passenger in the upper compartment. He then pulled the blue-green nylon bag towards him and "the Velcro fastener which covers the zipper ... pulled apart [and] out popped a greenish plastic bag with what appeared to me to be a marijuana stem sticking right through it." At this point Sheridan placed Morin under arrest and advised him of his

*Miranda* rights. Sheridan at the same time took possession of the nylon bags, although neither was apparently opened at that particular moment. The only statement made by Morin at this point in time was that neither the blue-green nor the black nylon bag belonged to him.

The two officers and Morin left the train at Lamy, New Mexico, and were driven back to Albuquerque by the officer who had received the initial tip. During the course of the trip back to Albuquerque, Morin admitted that the marijuana in the blue-green bag was his.[2] The bags were later searched at police headquarters in Albuquerque, and 42 pounds of marijuana were seized.

In denying Morin's motion to suppress, the district court held that the initial encounter between the police officers and Morin in the vestibule of the train was consensual in nature, as was the search of the burgundy colored nylon bag which Morin had identified as his. As concerns the seizure of the blue-green and black nylon bags from the luggage rack in the compartment where Morin had his seat, the district court held that such was based on probable cause, consisting of, *inter alia,* the strong odor of marijuana in the vicinity of the two bags and Sheridan's visual observation of marijuana sticking out of the blue-green nylon bag.

The denial of a motion to suppress is reviewed by us under the clearly erroneous standard. *United States v. Werking,* 915 F.2d 1404, 1406 (10th Cir.1990) and *United States v. Soto–Ornelas,* 863 F.2d 1487, 1490 (10th Cir.1988). In our view, the district court's denial of Morin's motion to suppress is not clearly erroneous.

As indicated, the only evidentiary matter before the district court was Officer Sheridan's narration of events. Clearly his testimony shows that the initial questioning of Morin was with the latter's consent. Morin also consented to the search of his burgun-

---

**2.** Counsel's position, in the district court and on appeal, is that Morin's statements were the "fruit of the poisonous tree." Counsel concedes that if we determine that there was no "poisonous tree," i.e., no illegal detention, there is no

basis for challenging Morin's statements to the Albuquerque police. *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939).

dy colored nylon bag, which is not surprising, since there was no contraband in that particular bag. While retrieving the burgundy colored nylon bag from an upper rack in the compartment, Sheridan's fellow officer indicated that he had detected a strong odor of marijuana in and around the doorway to the compartment. After searching the burgundy bag, Sheridan decided to check this out, and he, too, detected the smell of marijuana, and then, when he pulled the blue-green nylon bag toward him he saw marijuana. Certainly there was probable cause at that point to seize the blue-green and black nylon bags. This court has long recognized that marijuana has a distinct smell and that the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage. *United States v. Merryman,* 630 F.2d 780, 785 (10th Cir.1980); *United States v. Sperow,* 551 F.2d 808, 811 (10th Cir.1977), *cert. denied,* 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977); *United States v. Bowman,* 487 F.2d 1229, 1231 (10th Cir.1973). And of course, at that point in time, Morin stated that those particular bags were not his and belonged to someone else.

A consensual encounter between police and a private citizen occurs when there is voluntary cooperation by the private citizen in response to non-coercive questioning by the police officer. *United States v. Werking,* 915 F.2d 1404, 1407 (10th Cir. 1990); *United States v. Espinosa,* 782 F.2d 888, 890 (10th Cir.1986); *United States v. Cooper,* 733 F.2d 1360, 1363 (10th Cir. 1984), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984). We agree that Sheridan's encounter with Morin was consensual in nature in its inception, and that it continued to be such up to the point where the burgundy colored nylon bag was examined and found to contain no contraband.

Counsel's position is that Officer Sheridan should have stopped his investigation of Morin after the initial encounter in the vestibule, and that "every event which followed occurred during a period of illegal detention." Based upon the "totality of the circumstances" test, *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), Officer Sheridan did have probable cause to continue questioning Mr. Morin. Even though the tip received by the Albuquerque police department was anonymous, when combined with the observed behavior of the defendant on the platform; the fact he was seated in an area where single passengers are not normally seated; and the eventual discovery of the odor of marijuana on the train, it was not unreasonable for the officer to continue his investigation. After the smell of marijuana was detected, there was clearly probable cause to detain the luggage.[3]

*United States v. Johnston,* 497 F.2d 397 (9th Cir.1974), is similar to the present case. There the defendant purchased a one-way Amtrak ticket from San Diego to New York. He also carried his luggage onto the train rather than checking it. There the narcotics agent, having been advised of the foregoing by Amtrak officials, boarded the train and commenced observation of the defendant. Bending down, the agents sniffed the strong odor of marijuana coming from defendant's suitcases, whereupon, without warrant or consent, the agents forced open the suitcases and discovered marijuana. In upholding the district court's denial of defendant's motion to suppress, the Ninth Circuit rejected defendant's argument that he had a reasonable expectation of privacy from drug agents with "inquisitive nostrils." In *Johnston,* the Ninth Circuit also held that the forced opening of defendant's luggage was based on both probable cause (odor of

---

**3.** In *United States v. Scales,* 903 F.2d 765, 768 (10th Cir.1990), we stated that even without a search warrant or probable cause and exigent circumstances, law enforcement authorities having a "reasonable suspicion" that a piece of luggage contains narcotics may detain the luggage at least briefly to investigate the circum-

stances giving rise to such suspicion if the detention is properly limited in its scope. Here the officers had probable cause and there were exigent circumstances, i.e., a moving train, which justified a taking of the blue-green and black nylon bags.

marijuana) and exigent circumstances (the train was about to leave the station).

■ In support of the foregoing, see also the recent case of *Florida v. Bostick*, 501 U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), where the Supreme Court reversed the Florida Supreme Court and held that the Florida Supreme Court erred in adopting a *per se* rule that every "encounter" between a police officer and a private citizen on a public bus was a "seizure" within the meaning of the Fourth Amendment. Thus, the fact that in the instant case the police officers initiated their contact with Morin on a train from which Morin may not have felt "free to leave" does not in itself result in a "seizure." Under *Bostick*, the "totality of the circumstances" determines whether, and at what point in time, there is a "seizure". Where the encounter takes place is only one of many considerations.

We agree with the district court that the police officers violated none of Morin's Fourth Amendment rights. They were at a place where they had a right to be, i.e., the aisle of a railway car, and such is true even if there had been no anonymous tip. There was probable cause to question Morin, and Morin voluntarily engaged in conversation with the officers and produced his birth certificate to establish his identity. He clearly gave his consent to search the burgundy colored bag, which contained no contraband. They detected the odor of marijuana emanating from a piece of luggage bearing no identification. When Officer Sheridan pulled the luggage towards himself, it "pulled apart" and he observed what he believed to be marijuana. Morin was not asked to give his consent to a search of the other two bags, which he stated were not his. In short, the tree was not poisoned and hence there could be no tainted fruit, be it marijuana or his confession. *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939).

Judgment affirmed.