**The UNITED STATES of America, Plaintiff,**

v.

**Dennis P. DIMICK, Defendant.**

**Crim. No. 92–CR–66.**

United States District Court, D. Colorado.

April 28, 1992.

Kathleen M. Tafoya and Guy Till, Asst. U.S. Attys., Denver, Colo., for plaintiff.

David A. Lane, Joseph D. Swenson, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

NOTTINGHAM, District Judge.

Defendant Dennis P. Dimick stands accused of (1) possessing approximately 800 grams of methamphetamine with intent to distribute it, (2) traveling in interstate commerce with intent to distribute methamphetamine, (3) lying about his name to the Drug Enforcement Administration (DEA) agents who were investigating the case, and (4) possessing approximately sixty Xanax tablets containing a controlled substance called alprazolam. The matter is now before the court on defendant's motion to suppress evidence. Defendant, who was traveling by railroad from Roseville, California (a suburb of Sacramento) to St. Louis, Missouri, seeks to suppress the drugs which were seized from his luggage

and sleeping compartment on January 29, 1992. He claims that the seizures violated his rights under the Fourth Amendment to the United States Constitution.

The court held a suppression hearing which continued over three days, April 10, 15, and 16, 1992. The facts hereinafter recited constitute the court's factual findings concerning the suppression issues. After reviewing the testimony presented at the hearing and examining the briefs filed by the parties, I conclude that defendant's motion to suppress must be granted because the investigating agents lacked the required probable cause to search for and seize the defendant's bag positioned behind a pull-down bed in his sleeping compartment. All items seized subsequent to this initial unlawful search are "fruits of the poisonous tree" and must be suppressed.

## FACTS

On January 29, 1992, at approximately 7:45 p.m., AMTRAK passenger train no. 36 arrived in Denver from Los Angeles, California. The train was scheduled to leave Denver at 9:00 p.m. DEA Special Agent Greg Salazar and Detective Mark Spray (who had been specially deputized as a DEA agent) boarded the train to investigate violations of federal controlled substance laws. Although the agents had no particular information that evidence of such violations would be discovered on this specific train, the DEA regularly conducts such investigations, according to Agent Salazar, because drug couriers are traveling more frequently these days by train, having discovered that travel by train, in contrast to travel by airplane, is a good way to avoid metal detectors, x-ray searches of luggage, and (so they thought) narcotics agents.

"Have you noticed any suspicious or unusual behavior by any passenger on the train?" asked one of the agents, directing his question to a man who was wearing an AMTRAK uniform and appeared to be a conductor.[1] The conductor did not seem

---

**1.** Detective Spray and Agent Salazar both testified at the suppression hearing. The court had entered a witness sequestration order and Detective Spray was thus not present when Agent Salazar testified. The agents' testimony appears to be inconsistent in a number of collateral, yet

the least bit perplexed by the question. "There is one person," he instantly replied, identifying the person as the man in Compartment "A" of the railroad car. "He hasn't left his sleeping compartment the entire trip. He orders all his meals brought to the compartment, and he's a big tipper; he tips in $20 bills."

While one might initially wonder at the speed and certainty of the conductor's response if one knew nothing else about the situation, the fact is that this was not the first contact between DEA agents and this AMTRAK employee or other AMTRAK employees. DEA has a system of monetary rewards for train crew members who supply information which happens to lead to the arrest and conviction of drug offenders. Given the AMTRAK employee's prior contacts with DEA agents, it is also apparent why the employee would unhesitatingly focus on the behavior of Compartment A's occupant as suspicious: Agent Salazar himself testified that this behavior is characteristic of drug couriers. Drug couriers, he said, tend to remain isolated from other passengers, and, since the sleeping compartments cannot be locked from the outside by the occupant, they tend never to stray far from their luggage. On this foundation was built the decision to knock on the door of Compartment A and ask the occupant a few questions.

Shortly before 8:00 p.m., Salazar and Spray approached the compartment and knocked on the door. Defendant, who was inside, lifted the curtain covering the window in the door and peered out. He appeared to have just been awakened from

sleep, and the light was off.[2] Through the window, the agents showed defendant credentials identifying them as DEA agents. Defendant opened the compartment door. The agents could not see everything in the compartment, since the light was turned off.

After defendant opened the door, the agents (who were still standing outside the compartment) identified themselves and informed him that they were on the train "for the purpose of drug interdiction." Agent Salazar explained, somewhat disingenuously, that they tried to contact as many passengers as they could while the train was stopped and that they would simply like to talk with him. Defendant agreed, and the conversation continued with him standing just inside the doorway and the agents standing just outside.

"You don't happen to have your ticket, do you?" inquired Agent Salazar. Defendant responded by producing a ticket which bore the name "Dennis Horan." Reviewing the ticket, Agent Salazar quickly inferred that: (1) defendant boarded the train in Roseville, California; (2) defendant was traveling to St. Louis (via Chicago) and did not have a return ticket; and (3) defendant had paid $818 in cash for the ticket two days before his departure. These facts deepened Agent Salazar's suspicions, because: (1) Roseville, California is what DEA regards as a "source city" for the distribution of controlled substances, based on data supplied by informants and other sources of intelligence material; (2) St. Louis is a "destination city" for controlled substances; (3) drug couriers and drug

---

significant, details. For example, it was Detective Spray who said that the initial AMTRAK employee contacted was a man; Agent Salazar said the contact was a woman. (The agents' testimony was also inconsistent concerning the length and content of the conversation.) The discrepancies are bothersome to a fact-finder, because they suggest (at the very least) the existence of notable memory and/or perception lapses on the part of one or both agents whose testimony could be pivotal in making factual findings of constitutional proportion. I have generally credited the agent whose testimony on a given issue strikes me as more probable in the circumstances.

**2.** The agents' testimony conflicted on the issue of whether the light was on or off. Detective Spray (and Agent Salazar on his direct examination) testified that the light was on before the agents knocked and that defendant turned off the light only after they showed their law enforcement credentials through the compartment window. Inferring that defendant was hiding something, they became immediately suspicious. On cross examination, however, Agent Salazar testified that the light was off before the agents knocked. I credit this testimony because it seems consistent with both agents' acknowledgement that defendant seemed sleepy and did not seem to follow all of their initial questions.

dealers frequently purchase tickets and other items in cash in order not to leave a paper trail evidencing their activities; (4) couriers and dealers frequently buy only one-way tickets, even though a round-trip ticket is actually less expensive—at least so the agent thought.

"Is your name Dennis Horan?" Agent Salazar demanded to know, after he had reviewed the information on the ticket. "Yes," answered defendant, "it is."

"Could we see some form of identification?" insisted the agent. In response, defendant produced a driver's license which bore the name "Dennis Phil Dimick." Detective Spray asked defendant to explain the discrepancy between the ticket and the driver's license. There was a long pause. Detective Spray repeated the question. Defendant coughed. He fidgeted. He avoided eye contact with the agents. Finally, he answered that his fiancee, anxious to get married, had placed the reservation for the ticket in her last name, evidently to spite him.

This palpable prevarication stimulated further questioning. "Why are you going to St. Louis?" inquired one of the agents. "I have a house out there that I want to sell," replied Dimick. "Well, wouldn't it be easier and cheaper just to call a realtor on the telephone rather than traveling all the way from California to St. Louis?" persisted Detective Spray, perhaps overlooking the fact that realtors do not generally work *gratis.* Defendant did not have a good answer to this question—at least not one that either agent could recall. Instead, the nervous mannerisms intensified. Defendant's mouth became dry. His voice cracked, and he stuttered. He looked around and avoided eye contact. There ensued a discussion during which Detective Spray pointed out that paying cash for the ticket and traveling under an assumed name might make it difficult to prove to the IRS that the trip was a deductible expense which could decrease the taxable gain on the sale of defendant's home. Defendant's responses did not satisfy the agents, and they thought he was stalling.

The agents proceeded. "Do you mind if we come in to take a look around and look into your luggage?" one of them asked. "Yes, I do mind," declared Dimick, neglecting to specify whether he was answering both implicit parts of the question posed, or only one. "Things are a mess in here." The agents returned defendant's ticket and license to him and left the train at about 8:15 p.m. As Agent Salazar acknowledged, however, Dimick's exercise of his constitutional right to refuse the search merely heightened the agents' suspicions, and their investigation temporarily shifted elsewhere.

Having left the train, Salazar used his cellular telephone to launch a search of computerized criminal records, including the Narcotics and Dangerous Drugs Information System, for both of the names supplied by defendant. Five minutes later Salazar learned that "Dennis Dimick" had no record of criminal activity except for a drunk-driving conviction in California. Salazar also checked the train manifest inside the train station. It confirmed the information disclosed by defendant's ticket; it revealed no other useful information.

Meanwhile, Detective Spray spoke to an unidentified person (evidently an AMTRAK employee) in the railroad car. This person confirmed the information earlier supplied by the conductor but furnished no new information. Detective Spray then used a pay telephone in the train station to call an assistant United States Attorney for advice. Spray and the assistant decided to seize and detain defendant's luggage in order to subject it to a "sniff" by trained narcotics detection dogs. Arrangements were made to have narcotics dogs brought to the station for that purpose.

The agents' plan to seize defendant's luggage presented some logistical problems. They did not know (1) whether a dog was available or (2) how long it would take the dog to get to the station. The train was scheduled to leave at 9:00 p.m. (As it turned out, the departure was delayed for about half an hour; but the agents learned of the delay only as it was occurring.) Thus, the agents were prepared to seize

the luggage, to carry it from the train so that the train could continue on its way (separating defendant from the luggage if he chose to journey eastward), and to perform the dog "sniff" as soon as a dog arrived.

The agents did not even think about arrangements for reuniting defendant and his luggage in the event that the dog sniff failed to indicate the presence of drugs. According to Detective Spray, there was no discussion about the possibility of arranging for expedited delivery of the luggage to St. Louis. There was no discussion about the possibility of racing the train to Fort Morgan, Colorado (the train's next stop, 90 miles east of Denver) to deliver the luggage. To the extent that he even considered the issue, Spray simply believed it sufficient if delivery was made by U.S. mail to Dimick's location in St. Louis.[3]

Having decided to seize and detain defendant's luggage, the agents reboarded the train and returned to defendant's compartment at approximately 8:30 p.m. Salazar knocked and identified himself again. The interior light was on, but it was turned off before defendant opened the door. The agents again could not see into the darkened compartment. The agents told defendant that they intended to detain his luggage and subject it to a "sniff" by narcotics dogs. Defendant again exhibited all the signs of extreme nervousness previously discussed.

Apprehensive for their safety, the agents asked defendant to step out of the compartment into the hallway so that they could pat him down for weapons. No weapons were found, but a roll of currency was noticed in defendant's pocket. The currency was returned to him.

Defendant responded to the agents' announced intention to detain his luggage by claiming that he did not have any.[4] When questioned about the lack of luggage for a 36-hour train trip, defendant said that he planned to purchase clothes when he got to St. Louis. Believing that they now had only a few minutes before the train would depart, and believing that luggage would be found in the compartment, the agents entered the compartment. There is absolutely no evidence that defendant consented to the agents' entry.

After turning on the light, the agents noticed a cellular telephone, a coat, a pair of shoes, and various personal objects. Dimick claimed that this was all he had. Incredulous, Salazar looked inside the shoes and searched the coat with negative results. No luggage was in plain view. Salazar checked the bathroom; again, nothing. He then unlatched the overhead bunk and pulled it down and out from the wall, uncovering a black garment bag.

"Is this your luggage?" Salazar demanded of Dimick. Defendant hesitated a moment, then replied unresponsively, "Well, it's yours now."

"What do you mean, 'It's yours now,'?" said the agent. "It's yours now," defendant repeated. Salazar said he was going to give defendant a receipt for the bag, anyway. Defendant refused to provide a forwarding address. "So you're saying it's abandoned?" Salazar asked. "Yes," defendant responded, "that's right." The agents

---

**3.** Spray's testimony appears inconsistent with that of Agent Salazar. Paralleling the factual recitation advanced in the Government's prehearing brief, Salazar said the agents were concerned about the issue and intended to expedite delivery of the luggage to Dimick, in the event that the sniffing dogs failed to indicate the presence of drugs. They would do so either by Federal Express delivery or by meeting the train in Fort Morgan. Spray's testimony is more persuasive, primarily because it was he who formulated the seizure plans with the assistant U.S. attorney. Salazar's version suggests some degree of rationalization put together with the benefit of hindsight.

**4.** Erroneously recalling that he had earlier affirmed the existence of luggage, the agents believed that they had caught defendant in another lie and that this was another element of "reasonable suspicion" or "probable cause." As I have already found, however, defendant had never positively acknowledged that he did have luggage. He merely responded to a compound question by stating that he did mind if the agents searched. *See* discussion at p. 1546, *supra*.

gave defendant a receipt and left with the bag.

Salazar took the bag into the station and placed it with four other bags. He awaited the arrival of the sniffing dogs. Delayed slightly by mechanical difficulties, the train actually left at about 9:30 p.m. Drug detection dogs thereafter arrived and were allowed to sniff all the bags. One dog alerted on defendant's bag.

One dog having indicated the presence of narcotics in the bag, the agents placed the bag on the counter and opened it. The agents did not believe they needed a warrant to open the bag because the bag had been abandoned, and because the positive dog sniff gave them probable cause. The agents were also concerned that it might be difficult to apprehend the defendant if they let him continue to travel out of state before they obtained a warrant to open the bag. The bag's contents included approximately one kilogram of methamphetamine.

The agents alerted Ft. Morgan police, who arrested defendant when the train stopped in Fort Morgan a little after 11:00 p.m. The police also searched defendant's sleeping compartment, incident to his arrest. This search revealed, among other things, a quantity of Xanax tablets.

### ANALYSIS

The dispositive issue is whether the agents' warrantless seizure and search of defendant's black garment bag violated the Fourth Amendment. The Government advances four arguments. *First,* the circumstances existing at the time of seizure gave the agents a "reasonable suspicion" that Dimick was engaged in criminal activity, and a brief, warrantless seizure of luggage is justified if agents have a "reasonable suspicion" that criminal activity is afoot. *Second,* the same "reasonable suspicion" justified the agents' search of the train compartment. *Third,* even if "reasonable suspicion" is no justification for the search of the compartment, the agent's information rose to the level of probable cause, and

agents can conduct a warrantless search of a train compartment if they have probable cause to search. *Fourth,* the bag was abandoned, and agents do not need a warrant, probable cause, or reasonable suspicion to search abandoned luggage. I reject each of the Government's arguments.

### I

### IS "REASONABLE SUSPICION" THE LEGAL STANDARD BY WHICH TO EVALUATE THE SEIZURE OF LUGGAGE FOUND BEHIND THE PULL–DOWN BED?

Relying primarily on *United States v. Whitehead,* 849 F.2d 849, 854 (4th Cir.), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988), the Government argues that the luggage seizure here was justified by the agents' reasonable suspicion about defendant's status as a drug courier. Defendant first questions the factual premise of the Government's argument by suggesting that the circumstances here did not give rise to such a reasonable suspicion. I disagree.

Reasonable suspicion is often found where the subject of an investigation has behaved in specified unusual ways. Such behavior is said to suggest criminality based on "certain common-sense conclusions about human behavior." *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The following circumstances, *taken together* rather than in isolation, amount to reasonable suspicion: (1) defendant traveled by train, which, because of lack of security and x-ray devices, has increasingly become the mode of travel chosen by drug couriers; (2) he was traveling from a "source" city[5] to a "market" city; (3) he remained in his sleeping compartment throughout the trip and tipped heavily; (4) he purchased a one-way ticket in cash; (5) he traveled under a false name and initially gave the same

---

5. Salazar testified that Roseville is a suburb of Sacramento. Roseville can be considered a source city, said Salazar, because several meth-amphetamine manufacturing laboratories have been found in northern California.

false name to the agents; and (6) he exhibited a number of nervous and evasive mannerisms during questioning. *See Sokolow,* 109 S.Ct. at 1586; *United States v. Nurse,* 916 F.2d 20, 24 (D.C.Cir.1990) (and cases cited). I would have a difficult time finding that the behavior which preceded the agents' knock on the compartment—travel by train from Roseville to St. Louis, remaining in the sleeping compartment, and tipping heavily—has enough significance to establish anything whatsoever; such behavior is perfectly consistent with innocence. It is the cumulative effect of the remaining circumstances, however, which rises to the level of reasonable suspicion and permits further investigation of possible criminal conduct.

The Government claims that the agents' reasonable suspicions justified entry into the sleeper compartment and seizure of the luggage located behind the pull-down bed. No more than a reasonable suspicion is required, according to the Government, because the occupant of a sleeper compartment has little or no reasonable expectation of privacy and because the mobility of the train justifies a lower standard. Neither argument has merit.

■ The privacy expectations of a person renting a hotel room have been accorded full Fourth Amendment protection. *E.g., Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964). The person who rents a sleeping compartment on a train is in a similar position. According to undisputed testimony in this case, such a person pays a substantial sum of money, over and above a normal coach fare, to have the exclusive use of such a compartment. It can be locked from the inside. With the assistance of a porter or conductor, it can also be locked from the outside. Train personnel have only a limited right of entry to check tickets and investigate emergencies, and no other persons even have a right to be in the compartment. Curtains can be drawn, so that activities inside are not exposed to public view. The AMTRAK employee who testified characterized such a compartment as "a hotel room on wheels." I conclude

that defendant had a reasonable expectation of privacy in the rented sleeping compartment, similar to the expectation of one temporarily occupying a hotel room.

The Government correctly points out that a sleeping compartment on a train differs from a hotel room, in that the former regularly moves from jurisdiction to jurisdiction. This difference, however, does not justify a search of the sleeper compartment on mere suspicion. An analogy may be drawn to automobile searches: because of the inherent mobility of the automobile, there is danger that evidence will be removed or destroyed before a warrant can be obtained. Such exigent circumstances justify a warrantless search and seizure *based on probable cause. California v. Acevedo,* — U.S. —, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991); *United States v. Tartaglia,* 864 F.2d 837, 840 (D.C.Cir.1989). There is "a necessary difference between a search of store, dwelling house or other structure" where a warrant can be readily obtained and "a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925).

■ In this case, I need not and do not decide whether the mobility of a sleeping compartment is an exigent circumstance which would justify a warrantless search. *See generally United States v. Morin,* 949 F.2d 297, 300 n. 3 (10th Cir.1991) (suggesting that moving train can support a finding of exigent circumstances to support a warrantless search with probable cause). Because defendant's reasonable expectation of privacy in a sleeper compartment is similar to the expectation enjoyed by the occupant of a hotel room, and because the "automobile search" cases teach that warrantless searches of mobile objects must still be supported by probable cause, I hold only that probable cause was required to search defendant's train compartment and

seize objects therein. Reasonable suspicion was not enough.

For reasons stated above, I disagree with the analysis in *United States v. Whitehead,* 849 F.2d 849, 854 (4th Cir.), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988) to the extent that *Whitehead* can be read to allow all searches of train sleeping compartments based only on reasonable suspicion. *Whitehead* justified this lesser standard partly by analogy to the automobile search cases, 849 F.2d at 853–55, an analogy which does not appear to support this conclusion. It also justified the lesser standard by observing that the railroad industry is heavily regulated. As the testimony in the case before me confirmed, however, this regulation is directed at the railroads themselves and cannot be said to diminish the passengers' expectations of privacy. *Whitehead,* 849 F.2d at 861 (dissenting opinion). Finally, I note that *Whitehead* is factually distinguishable: defendant there had invited the officer into the sleeping compartment, and the luggage seized was in plain view. In response to defendant's statement that the officer "bring on your dogs," a dog sniff of the luggage was undertaken—with positive results. It is not clear to me that even the *Whitehead* court would have countenanced the search which the agents here undertook. As the court carefully noted, "There is no indication that the police officers moved any of Whitehead's effects or that they looked into any area of the compartment that was not in plain view." *Whitehead,* 849 F.2d at 853 n. 11.

## II

DID THE SEIZURE AND DETENTION OF THE LUGGAGE HERE EXCEED THE SCOPE OF A SEIZURE AND DETENTION JUSTIFIED ONLY BY A "REASONABLE SUSPICION" OF CRIMINAL ACTIVITY?

■ The controlling cases on this issue are *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) and *United States v. Scales,* 903 F.2d 765 (10th Cir.1990). *Place* addressed a Government request that the Court "recognize the reasonableness under the Fourth Amendment of warrantless seizures of personal luggage from the custody of the owner on the basis of less than probable cause, for the purpose of pursuing *a limited course of investigation,* short of opening the luggage, *that would quickly confirm or dispel the authorities' suspicion.*" 462 U.S. at 702, 103 S.Ct. at 2642 (emphasis supplied). Citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court acceded to the request:

> [W]hen an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigation is properly limited in scope.

462 U.S. at 706, 103 S.Ct. at 2644.

The "limited course of investigation ... that would quickly confirm or dispel the authorities' suspicion" in *Place* was a dog sniff of Place's luggage. The Court expressly stated that a dog sniff is *sui generis:* it is at once both limited (in that it can be done quickly, without opening the bag and exposing its private contents) and reliably precise (in that a narcotics dog can detect the presence or absence of narcotics, thus permitting further investigation or the return of the bag). Because of the restricted and discriminating nature of a canine sniff, the Court concluded that such a sniff performed on luggage located in a public place was not even a "search" as the Fourth Amendment defines the term.

Having decided that a dog sniff is so limited and non-intrusive that it does not even rise to the level of a search, the *Place* Court next considered what standard investigators must satisfy before seizing or detaining a person's luggage for a dog sniff. Referring again to *Terry,* the Court said that "the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause." 462 U.S. at 709, 103

S.Ct. at 2645. *Terry,* in turn, permitted a brief investigative detention, based on an officer's reasonable, articulable suspicion that the suspect has been, is, or is about to be engaged in criminal activity. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. Such *"Terry* stops" must be distinguished from "arrests, which are even more intrusive and must be supported by probable cause." *United States v. Ward,* 961 F.2d 1526, 1529 (10th Cir.1992).

In *Scales,* the Tenth Circuit applied *Place* to a situation where DEA agents had seized a train passenger's luggage and subjected it to a dog sniff seven hours later. Because the Supreme Court had regarded a 90–minute seizure as unreasonable in *Place,* the Tenth Circuit had no trouble finding this seven-hour seizure unreasonable. The *Scales* court also found two other things to be important. First, the agents did not consider alternative courses of action which would have minimized the intrusion. Second, the agents did not tell the defendant how long they were keeping the luggage, where they were taking it, or what arrangements would be made for its return. 903 F.2d at 769; *Place,* 462 U.S. at 710, 103 S.Ct. at 2646 (Fourth Amendment violation exacerbated by agents' failure to inform defendant of arrangements for return of luggage).

The Government's actions here find no support in the teachings of *Place* and *Scales.* The key aspects of a *Place* seizure are brevity and minimal intrusiveness. Surely the Government would not argue that the agents, based only on reasonable suspicion, could forcibly remove Dimick from the train, allow the train to leave without him, wait an hour for a narcotics dog, and then claim that this is the brief sort of investigative detention of the person which *Terry* permitted. *See Florida v. Royer,* 460 U.S. 491, 503–05 & n. 10, 103 S.Ct. 1319, 1327–28 & n. 10, 75 L.Ed.2d 229 (1983) (plurality opinion) (detention of defendant and his luggage on reasonable suspicion went beyond *Terry* where defendant was removed from place of encounter by agents, agents failed to have narcotics dog available for quick investigation, agents' show of authority implied that defendant was not free to leave, and agents did not advise defendant he could refuse consent to search; Court also noted that delay to obtain dog sniff which may cause defendant to miss his flight if results were negative would "be a very serious matter"). If (as *Place* teaches), *Terry* standards apply to seizure and detention of luggage, then neither could the agents dispossess Dimick of his luggage and retain it after the train departed. While the narcotics dog appears to have alerted on the luggage within about an hour of its seizure from Dimick, that span of time alone is less significant than the period of time that would have elapsed before the luggage could be returned to Dimick. It could have taken several days for the bag to reach Dimick by Detective Spray's contemplated mode of shipment—the United States mails. Even if I were to credit the claim that the agents were prepared to race the train to Fort Morgan so that Dimick could have his luggage (had the dog not alerted on it), he would have been divested of the luggage for about two hours. This is simply not the brief, limited intrusion permitted by *Place.*

## III

## WAS THE SEARCH SUPPORTED BY PROBABLE CAUSE?

■ The Government's first alternative argument is that the agents had probable cause to search for defendant's luggage and seize it from him and that they were thus not bound by the constraints placed on a seizure justified only by reasonable suspicion. "[P]robable cause means 'a fair probability that contraband or evidence of a crime will be found.'" *Sokolow,* 109 S.Ct. at 1585, quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). It is obviously a more demanding standard than "reasonable suspicion." *Id.*

I have found that the facts known to the agents amount to "reasonable suspicion." The reported cases support the same conclusion. I decline to go farther and accept the Government's argument that these

same facts add up to probable cause. In each of the cases cited by the Government, there were additional facts pointing toward the conclusion that there were narcotics in the area where the agents proposed to search. *E.g., Tartaglia*, 864 F.2d at 841 (narcotics-trained dog alerted to defendant's train compartment); *Morin*, 949 F.2d at 298 (agent had tip that defendant might be courier and detected odor of marijuana in compartment). To accept the Government's contention here would be to obliterate this distinction between reasonable suspicion and probable cause.

## IV

### CAN THE SEARCH BE JUSTIFIED AS A SEARCH INCIDENT TO ARREST?

■ The Government makes a weak attempt to justify the seizure of the bag as a search incident to arrest. *See, e.g., Chimel v. California*, 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969). The argument is based on the supposition that the agents, at the moment of seizure, had probable cause to arrest Dimick for making false statements to a federal agent in violation of 18 U.S.C.A. § 1001 (West 1976), in light of the inconsistent information he had given concerning his name. The short and sufficient answer to the argument is that there was no arrest. Since the justifications for a warrantless search incident to arrest are premised on the exigencies created by a valid actual arrest, *see id.*, there is no basis, theoretical or practical, for treating this as a search incident to arrest. *See Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 2004, 36 L.Ed.2d 900 (1973) (where there was probable cause, but no formal arrest, full *Chimel* search would not have been justified) (*dictum*).

## V

### WAS THE SEIZURE JUSTIFIED ON THE GROUND THAT THE LUGGAGE WAS ABANDONED?

■ The Government's final alternative argument is that the garment bag was abandoned and that defendant therefore retained no privacy interest in the bag. *See United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir.), *cert. denied*, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983). The claim must be rejected, for two reasons. First, the facts do not support a finding that the bag was really abandoned. Second, any such abandonment was an involuntary product of the prior illegal seizure.

The Tenth Circuit has established that the test for abandonment is "whether an individual has retained any reasonable expectation of privacy in the object." *Id.* (citations omitted). "An expectation of privacy is a question of intent which 'may be inferred from words spoken, acts done, and other objective facts.'" *Id.*, quoting *United States v. Kendall*, 655 F.2d 199, 201 (9th Cir.1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1434, 71 L.Ed.2d 652 (1982). Here, the facts are simply too ambiguous to support a finding that defendant abandoned the black bag. To the agent's inquiry as to whether it was his bag, defendant twice responded with the evasive and sardonic statement, "Well, it's yours now." The statement may be reasonably interpreted (in these circumstances) as an attempt to avoid an express admission of ownership. It may also be interpreted as a sarcastic commentary that, while it was indeed defendant's suitcase, the agent had obviously taken it from him and was about to take it from the train. The agents were not misled, for they obviously did not treat the bag as abandoned property: they gave defendant a receipt for it, and they waited to open it until the dog sniff had established probable cause (instead of treating it as abandoned property and opening it right away). Defendant's statement notwithstanding, nobody in the railroad car that night thought the property was abandoned. Neither does the court.

Even if there was abandonment, it was the involuntary product of the prior illegal seizure. Any abandonment must be voluntary. *Jones*, 707 F.2d at 1172. To support a claim that the abandonment was involuntary, the defendant must show a nexus between allegedly unlawful police conduct and the abandonment of the property.

*United States v. Ward,* 961 F.2d at 1535; *United States v. Labat,* 696 F.Supp. 1419, 1426 (D.Kan.1988).

Defendant argues that there is an obvious nexus between the unlawful search of the sleeping compartment and the circumstances which arguably support a finding of abandonment here. I agree. It would be "sheer fiction" to presume that the disclaimer of ownership was caused by anything other than the illegal search of the compartment and the seizure of the bag. *United States v. Beck,* 602 F.2d 726, 730 (5th Cir.1979). Thus, defendant's "disclaimer" was tainted by the illegal action, and the abandonment was involuntary.

## Conclusion

Probable cause was required before the agents could search defendant's sleeping compartment and seize the bag hidden behind the pull-down bed. Probable cause did not exist. Thus, evidence found in the bag (as well as evidence later found when, based on the evidence in the bag, defendant was arrested) must be suppressed. In light of this disposition of the case, I need not and do not reach any other ground for suppression urged by defendant. It is therefore

ORDERED that the defendant's motion to suppress is granted.