**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

TIMOTHY SEAN SCHEETZ, a/k/a Germ,
a/k/a G,
            *Defendant-Appellant.*

No. 01-4177

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

THOMAS WALKER LABUWI, II,
            *Defendant-Appellant.*

No. 01-4183

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

CLIFTON SCOTT BROOKS, JR., a/k/a
Blue Eyes, a/k/a Benjamin Michael
Mendoza, a/k/a Benjamin A.
Martin,
            *Defendant-Appellant.*

No. 01-4243

Appeals from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, Senior District Judge.
(CR-00-78-F)

Argued: April 4, 2002

Decided: June 6, 2002

Before NIEMEYER, Circuit Judge,
HAMILTON, Senior Circuit Judge, and
W. Craig BROADWATER, United States District Judge for the
Northern District of West Virginia, sitting by designation.

_____

Affirmed by published opinion. Senior Judge Hamilton wrote the
opinion, in which Judge Niemeyer and Judge Broadwater joined.

_____

**COUNSEL**

**ARGUED:** Joseph Bart Gilbert, MCNEIL & GILBERT, Jackson-
ville, North Carolina, for Appellant Scheetz; Joseph Blount Cheshire,
V, CHESHIRE & PARKER, Raleigh, North Carolina, for Appellant
Labuwi; Joseph Edward Zestotarski, Jr., POYNER & SPRUILL,
L.L.P., Raleigh, North Carolina, for Appellant Brooks. Christine Wit-
cover Dean, Assistant United States Attorney, Raleigh, North Caro-
lina, for Appellee. **ON BRIEF:** John Stuart Bruce, United States
Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh,
North Carolina, for Appellee.

_____

**OPINION**

HAMILTON, Senior Circuit Judge:

   In this consolidated criminal appeal, Timothy Scheetz (Scheetz),
Thomas Labuwi (Labuwi), and Clifton Scott Brooks (Scott Brooks)
appeal from the district court's judgment entered in their respective
cases. We affirm.

# I

## A

In late 1993, Benjamin Brooks moved from Florida to a house in Fayetteville, North Carolina that his cousin, Scheetz, was sharing with Mary Olivas (Olivas) and Donald Hayes (Hayes). Shortly after he moved in, Benjamin Brooks began to assist Scheetz with his drug distribution operation by distributing marijuana and collecting money. In general, Scheetz's drug distribution operation purchased and sold drugs on the front.[1]

In January or February 1994, Scheetz and Olivas moved to Southern Pines, North Carolina, which allowed Benjamin Brooks, who remained at the Fayetteville house with Hayes, to become more active in Scheetz's Fayetteville operations. In addition to his responsibilities of delivering marijuana and collecting money, Benjamin Brooks began to receive marijuana shipments and prepare the marijuana for distribution. The marijuana shipments, weighing twenty to thirty pounds each, came from Scheetz's source in California and were delivered by way of Federal Express.

In April 1994, the house in Fayetteville was searched by law enforcement officers who found marijuana and methylenedioxymethamphetamine (Ecstasy). Following the search, Hayes and Benjamin Brooks were arrested and charged with violations of North Carolina state drug laws. In November 1994, Hayes and Benjamin Brooks left for Pennsylvania to avoid being convicted of the pending North Carolina state drug law charges.

In the spring of 1996, Todd Davis (Davis) met Labuwi at Sandhills Community College, which they were both attending. Labuwi distributed marijuana for the Scheetz drug distribution operation and also helped in breaking down marijuana shipments. In 1997, Labuwi introduced Davis to Scheetz, and, in the spring of 1997, Davis began buying marijuana from Labuwi. Around this same time frame, Davis, along with Labuwi, went to Scheetz's house to help breakdown mari-

---

[1]"Fronting" is the practice of supplying narcotics on credit.

juana shipments, which were now arriving from Scheetz's California source in crates delivered by various freight companies and were averaging 200 pounds.

Davis also performed several other tasks for Scheetz's drug distribution operation. He went to Pennsylvania to collect money from Benjamin Brooks and Hayes, made a trip to California to pay Scheetz's California source, and delivered money on several occasions to a courier for the California source at various locations in Raleigh and Charlotte, North Carolina.

In July 1997, Benjamin Brooks and Hayes were arrested in Pennsylvania. After Benjamin Brooks was placed on bond, Scheetz and Davis went to Pennsylvania and brought Benjamin Brooks back to Southern Pines, North Carolina. A short time later, Benjamin Brooks moved to Wilmington, North Carolina and, once again, began selling marijuana for the Scheetz drug distribution operation.

In August 1997, Benjamin Brooks and Davis began selling marijuana to Scott Brooks. Thereafter, Scott Brooks became more involved in the Scheetz drug distribution operation. Scott Brooks went to Raleigh, North Carolina to obtain marijuana from Scheetz and also assisted Scheetz and others in breaking down the marijuana shipments which, at that time, were ranging between 150 and 300 pounds.

In February 1998, the apartment Benjamin Brooks and Davis shared in Wilmington was searched by law enforcement officers and Davis was arrested and charged with North Carolina state drug law violations. In July 1998, Scott Brooks was arrested and charged with violating North Carolina state drug law after his car was stopped for a traffic infraction by law enforcement officers in Wrightsville Beach, North Carolina. During a subsequent search of the car and Scott Brooks's person, the law enforcement officers recovered marijuana and a large amount of money.

In 1999, Labuwi began to distribute Ecstasy for Scheetz. According to Davis, the Scheetz drug distribution operation received at least four shipments of Ecstasy from a source in Florida.

After Davis had served his sentence on the North Carolina state drug law charges stemming from his arrest in February 1998, he resumed working for Scheetz. After resuming his association with Scheetz, Davis began distributing marijuana with Jeff Baker (Baker) and one of their customers was Michael Hagins. Michael Hagins became indebted to them for marijuana, and when he was unable to pay them, Davis and Baker paid Scheetz the money due. After Davis and Baker stopped supplying Michael Hagins with marijuana, they began selling marijuana to Michael Hagins' brother, Ed Hagins, who also got behind in his payments for the marijuana.

In February 2000, Davis was again arrested on North Carolina state drug law charges after a shipment of Ecstasy was seized. Scheetz was paying for the Ecstasy with money that was owed to his California marijuana source. After the shipment of Ecstasy was seized, Scheetz needed money to pay his California marijuana source.

In an effort to raise money to pay the California marijuana source, Scheetz called Michael Hagins, threatened to kill him and his family if his debt to Davis and Baker was not paid, and told Michael Hagins that he was responsible for Ed Hagins' debt because, while Scheetz knew Michael Hagins, he did not know Ed Hagins.

Meanwhile, Scheetz was trying to collect all monies owed to his organization in order to recoup the loss from the Ecstasy seizure because his California marijuana source was pressuring him for payment. Matthew Lamb (Lamb), another distributor for Scheetz, had a customer, Shane Hunsucker (Hunsucker), and Scheetz thought Hunsucker owed Lamb money. Consequently, on April 9, 2000, Scheetz, Scott Brooks, and Lamb went to Hunsucker's residence to collect the money. Scott Brooks held a gun to Patrick Lovette (Lovette), Hunsucker's roommate, while Scheetz did the same to Hunsucker. Scheetz gave his gun to Scott Brooks and told him to keep the weapons on both Lovette and Hunsucker. Scheetz then stuck a pair of clippers up Hunsucker's nose and threatened him. The next day, Lamb and Labuwi went to Hunsucker's house and Hunsucker paid them some money.

Thereafter, on the evening of April 10, 2000, Scheetz, Labuwi, Scott Brooks, and Lamb went to Pembroke, North Carolina intending

to go to Michael Hagins' residence to collect the money he owed to Davis and Baker. On the way, they stopped at a Wal-Mart where they purchased black clothing for Labuwi. When they got near Michael Hagins' residence, Scheetz, Labuwi, and Scott Brooks changed into black clothing and put dark paint on their faces. Scheetz handed out guns to Labuwi and Scott Brooks. Lamb stayed in the car, while Scheetz, Labuwi, and Scott Brooks went to what they thought was Michael Hagins' residence, but turned out to be the residence occupied by Marcus Locklear (Locklear) and Jennifer Lester (Lester). The trio kicked in the door, told Locklear to get down, and Labuwi shot Locklear, killing him. Lester saw two of the people; the one whose voice she recognized as Scheetz's was standing across from her, and the other passed in front of her doorway holding a weapon. She heard a third person speaking from the door area. When they realized she was there, they left the residence, Scheetz leaving last and saying they would return. As they exited the residence, Michael Hagins' roommate, Ronald Floyd (Floyd), drove up. Floyd was driving his Chevrolet Camero which Michael Hagins had borrowed when he had gone to pick up marijuana from Scheetz. As the trio went by, they shot at Floyd, striking him in both legs. After they returned to the car, Labuwi said that he had shot Locklear, and Scott Brooks said that he had shot at the car driven by Floyd to keep Floyd from following them.

B

On October 18, 2000, by way of a superseding indictment returned by a federal grand jury sitting in the Eastern District of North Carolina, Scheetz, Labuwi, and Scott Brooks were charged in count one with conspiracy to distribute and to possess with the intent to distribute in excess of twenty kilograms of Ecstasy and in excess of 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846, and in count three with using or carrying firearms during and in relation to the count one conspiracy (with said firearms being discharged) in violation of 18 U.S.C. § 924(c). In count two, Scheetz was charged with conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A), (a)(1)(B), and (h).

Scheetz, Labuwi, and Scott Brooks each pled not guilty, and, prior to the beginning of the trial, Scott Brooks unsuccessfully moved to

suppress the marijuana and the money that was discovered after his car was searched by law enforcement officers in July 1998. The jury trial began on October 31, 2000, and, on November 8, 2000, Labuwi changed his pleas to guilty and entered pleas of guilty to counts one and three. The trial continued as to Scheetz and Scott Brooks. On November 13, 2000, the jury returned its special verdict in the case. The jury found Scheetz guilty of counts one and two as charged, and guilty of count three, but the jury found that the government had failed to prove that Scheetz had discharged a firearm. The jury found Scott Brooks guilty under count one of the lesser-included offense of conspiracy to distribute and to possess with the intent to distribute less than fifty kilograms of marijuana. The jury also found Scott Brooks guilty of count three, but, like Scheetz, found that the government failed to prove that Scott Brooks had discharged a firearm.

The district court sentenced Scheetz to life imprisonment on count one, 240 concurrent months' imprisonment on count two, sixty consecutive months' imprisonment on count three, restitution of $26,374.22, and a $300 special assessment. Labuwi was sentenced to life imprisonment on count one, 120 consecutive months' imprisonment on count three, restitution of $26,374.22, and a $200 special assessment. Scott Brooks was sentenced to 60 months' imprisonment on count one and, following an upward departure, the district court sentenced Scott Brooks to 262 consecutive months' imprisonment on count three, for a total sentence of 322 months' imprisonment. Scott Brooks was also sentenced to restitution of $26,374.22 and a $200 special assessment. Scheetz, Labuwi, and Scott Brooks each noted a timely appeal.

II

Scott Brooks contends the district court erred in denying his motion to suppress. We review factual determinations made by the district court at a suppression hearing for clear error, and the district court's legal conclusions are reviewed by this court *de novo*. *United States v. Han*, 74 F.3d 537, 540 (4th Cir. 1996).

The facts concerning the stop of Scott Brooks's car in July 1998 are as follows. On July 10, 1998, the New Hanover County Sheriff's Department conducted a checkpoint in Wrightsville Beach, North

Carolina. The law enforcement officers erected two signs on Salisbury Street visible to eastbound motorists approaching the checkpoint. Both signs read "K-9 CHECK POINT AHEAD" and were placed approximately 100 feet apart. (J.A. 95). The checkpoint itself —where law enforcement officers actually were stopping motorists— was visible from the location of the first sign.

The operational plan to be implemented by the checkpoint was two-fold. Law enforcement officers stationed at the checkpoint itself were to request and examine motorists' driver's licenses and vehicle registration cards and be alert for impaired drivers. In addition, narcotics officers observing from unmarked vehicles nearby were to watch for motorists who threw items out of their vehicles or who made u-turns or other evasive actions upon seeing the "K-9 CHECK POINT AHEAD" signs. The narcotics officers planned to investigate any vehicle involved in such conduct.

The narcotics officers were seated in unmarked police vehicles on Pelican Drive just beyond the first checkpoint sign and about 100 feet from the checkpoint itself. Pelican Drive runs parallel to Salisbury Street and the two streets are separated by a grass median. Crossing the median is not permitted, as indicated by double yellow lines on Salisbury Street.

Although the two signs alerted motorists that there was a "K-9 CHECK POINT AHEAD," in fact, there was no K-9 officer at the checkpoint. A K-9 officer was present and available to assist, however, in a vehicle parked near the narcotics officers who were observing the activities from Pelican Drive.

The narcotics officers stationed on Pelican Drive observed a burgundy Pontiac Grand Am approach the checkpoint signs and then execute an illegal u-turn across the grass median after passing the first checkpoint sign but before reaching the checkpoint itself. Upon observing that conduct, the narcotics officers pursued the Grand Am and executed a stop.

Three narcotics officers approached the stopped car. Narcotics officers Almeida and Kennedy approached the driver's side and requested a driver's license and vehicle registration card from the

driver, Scott Brooks. Narcotics officer Blackmon approached the passenger's side and immediately signaled to narcotics officers Almeida and Kennedy that he smelled the odor of marijuana emanating from the interior of the car. Narcotics officers Almeida and Kennedy smelled the same strong odor at the same time.

Upon smelling the odor of marijuana, the narcotics officers directed Scott Brooks to step out and stand at the rear of the car. The narcotics officers sought Scott Brooks's consent to search the car but Scott Brooks declined to give his consent. Based on the strong odor of marijuana emanating from the car, the narcotics officers conducted a search of the car, and, during the search, narcotics officer Kennedy discovered marijuana in a knapsack inside the car. Upon the discovery of the marijuana, the narcotics officers arrested Scott Brooks and conducted a search of his person during which they recovered and seized $2,725.

According to Scott Brooks, the district court erred in allowing into evidence the evidence seized following the stop of his car because the stop of his car was part of a checkpoint whose primary purpose was drug interdiction, and, therefore, the checkpoint was unconstitutional. *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000) (holding that a checkpoint whose primary purpose is drug interdiction is unconstitutional). In making this argument, Scott Brooks posits that the government should not be permitted to use his illegal actions in seeking to avoid the illegal checkpoint as a basis to justify the stop.

We find nothing improper with respect to the stop and subsequent search of Scott Brooks's car and person. Because of his vehicular flight prior to arriving at the checkpoint, Scott Brooks was not seized for Fourth Amendment purposes by the show of police authority by virtue of the checkpoint signs or the checkpoint itself. *California v. Hodari D.*, 499 U.S. 621, 626-29 (1991) (no seizure for Fourth Amendment purposes when a defendant did not acquiesce in the show of police authority); *id.* at 629 ("Assuming that [the officer's] pursuit . . . constituted a 'show of authority' in enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled."); *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) (holding that for purposes of determining whether the roadblock worked a Fourth Amendment seizure, the controlling considerations

are whether: (1) the motorist "was meant to be stopped by the physical obstacle of the roadblock"; and (2) the motorist "was so stopped"); *Latta v. Keryte*, 118 F.3d 693, 700 (10th Cir. 1997) (holding that a fleeing motorist was not seized for Fourth Amendment purposes until the law enforcement officers were successful in stopping the motorist at a roadblock); *Bella v. Chamberlain*, 24 F.3d 1251, 1256 (10th Cir. 1994) (holding that, unless the law enforcement officer's show of authority succeeds in restraining a person, the person has not been seized within the meaning of the Fourth Amendment). Consequently, Scott Brooks's commission of a traffic infraction provided a basis for the stop of his car. *Wren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Once the car was properly stopped and the narcotics officers smelled marijuana, the narcotics officers properly conducted a search of the car. *United States v. Morin*, 949 F.2d 297, 300 (10th Cir. 1991) (holding that, because marijuana has a distinct smell, "the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage"). Finally, the money found on Scott Brooks's person was properly admitted as evidence seized pursuant to a lawful arrest. *Chimel v. California*, 395 U.S. 752, 762-63 (1969) (holding that a search incident to a lawful arrest does not violate the Fourth Amendment); *United States v. Nelson*, 102 F.3d 1344, 1346 (4th Cir. 1996) (same). Accordingly, the district court did not err when it denied Scott Brooks's motion to suppress.

III

Scheetz contends that the district erred when it prevented him from asking cooperating government witnesses about the Sentencing Guidelines ranges they were facing. A district court's restrictions on cross-examination are reviewed for an abuse of discretion. *United States v. Ambers*, 85 F.3d 173, 175 (4th Cir. 1996).

During Scheetz's counsel's cross-examination of the government's first witness, Mitchell Skowron (Skowron), a marijuana customer of Scheetz, Scheetz's counsel asked Skowron about a statutory sentencing enhancement and whether only the government can decide to make a substantial assistance motion. After Scheetz's counsel started this line of questioning, the district court gave the jury an instruction

on how the federal sentencing process operates, including a detailed explanation of the Sentencing Guidelines and the concept of substantial assistance. At the conclusion of the district court's instruction, the district court asked Scheetz's counsel if he wanted a "further instruction on that issue," (J.A. 163), to which counsel for Scheetz responded in the negative. Later on in the trial, when counsel for Scheetz attempted to ask Davis a question concerning his "guideline range," (J.A. 527), the district court sustained the government's objection. Counsel for Scheetz attempted to ask a similar question during his cross-examination of Baker, but the district court again sustained the government's objection. During his cross-examination of Davis and Baker, counsel for Scheetz asked each of these witnesses about their plea agreements and the maximum and minimum sentences they were facing, and each of these witnesses indicated that they hoped to get a reduction in their sentence for cooperating with the government. In addition to Davis and Baker, counsel for Scheetz elicited similar responses from the government's other cooperating witnesses.

We conclude the district court did not err in refusing to allow Scheetz's counsel to ask questions concerning Sentencing Guidelines ranges. In *Ambers*, we upheld restricting cross-examination to the minimum and maximum penalties the cooperating government witness was facing, whether the cooperating government witness was testifying to gain a reduced sentence, and the terms of his plea agreement concerning a downward departure. 85 F.3d at 176-77. We found that this line of questioning was sufficient to explore the motivation of the cooperating government witness in testifying. *Id.* In reaching this conclusion, we rejected the notion that the defendant was entitled to question a cooperating government witness concerning how his potential sentence reduction fit into the structure of the Sentencing Guidelines, reasoning that such questioning "might do much to confuse lay jurors and little to enlighten them." *Id.* at 177.

In this case, the cooperating government witnesses testified to both the minimum and maximum sentences they faced, which was frequently life, and testified that they knew they faced substantial sentences which they hoped to get reduced. Because any potential bias on the part of the cooperating government witnesses was brought out before the jury by these inquiries, the district court did not abuse its

discretion when it limited Scheetz's counsel's cross-examination of Davis and Baker.[2]

IV

After Baker was arrested by federal authorities on April 13, 2000, he agreed to assist them in locating Scheetz, Labuwi, Scott Brooks, and Lamb, the individuals who had fled following the murder of Locklear. The federal authorities planned to locate Scheetz by tracing a call. After Baker paged Scheetz, Scheetz returned the page and the resulting conversation was recorded. In that conversation, Scheetz intimated that Scott Brooks possessed a firearm during the attack on Locklear. At the time the tape was introduced into evidence at trial, the district court instructed the jury that it was only being admitted against Scheetz and should not be considered in relation to Scott Brooks. The district court gave the same instruction at the time the transcript of the tape was admitted. In addition, the district court instructed the jury about the limited use of the tape when the tape was played during Baker's testimony.

During the government's rebuttal closing argument, the prosecutor referred to Scheetz's statement on the tape that intimated that Scott Brooks possessed a firearm during the attack on Locklear in rebutting Scott Brooks's closing argument that the testimony of Lamb provided the only evidence that Scott Brooks possessed a firearm. Scott Brooks immediately objected, and the district court instructed the jury not to consider Scheetz's statement against Scott Brooks.

Scott Brooks contends that the prosecutor's comment entitles him to a new trial. This argument is without merit.

---

[2]Scheetz also argues that the district court gave the jury a technical instruction concerning the Sentencing Guidelines and the concept of substantial assistance and that this technical instruction confused the jury and, consequently, undermines the outcome of the trial. Although the district court's jury instruction concerning the Sentencing Guidelines and the concept of substantial assistance was unnecessary under *Ambers*, the content of the district court's jury instruction was legally correct, as Scheetz apparently concedes, and, under the circumstances of this case, the jury instruction itself did not have the effect of misleading or confusing the jury or prejudicing Scheetz in any way.

In reviewing a claim of prosecutorial misconduct, we review the claim to determine whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Morsley*, 64 F.3d 907, 913 (4th Cir. 1995) (citations and internal quotation marks omitted). The test for reversible prosecutorial misconduct has two components; first, the defendant must show that the prosecutor's remarks or conduct were improper and, second, the defendant must show that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial. *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993). In evaluating the question of prejudice, we have noted that a number of factors are relevant, namely: (1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury. *United States v. Wilson*, 135 F.3d 291, 299 (4th Cir. 1998).

In this case, the prosecutor's comment, although improper (as the government concedes), was one isolated comment made during an extensive rebuttal closing argument. And while it may be said that the prosecutor's comment misled the jury and prejudiced Scott Brooks in a slight way, there was other evidence in the record concerning Scott Brooks's possession of a firearm. For example, Floyd testified that all three of the people that ran by him had weapons. The slight prejudice suffered by Scott Brooks was most assuredly cured by the district court's immediate curative instruction and there is nothing in the record to suggest that the prosecutor's comment was deliberately placed before the jury to divert its attention to extraneous matters. Most importantly, absent the prosecutor's improper remark, the government's case against Scott Brooks was overwhelming. After considering all of these factors, we conclude that the prosecutor's improper remark did not so infect "the trial with unfairness as to make the resulting conviction a denial of due process." *Morsley*, 64 F.3d at 913 (citations and internal quotation marks omitted).

V

In sentencing Scheetz and Labuwi on count one, the district court applied United States Sentencing Commission, *Guidelines Manual*, (USSG) § 2D1.1(d)(1), which directs the district court to apply USSG § 2A1.1, the first-degree murder Sentencing Guideline, in sentencing a defendant for a drug offense "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States." USSG § 2D1.1(d)(1).[3] Section 1111(a) provides:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by . . . any . . . kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery . . . is murder in the first degree.

18 U.S.C. § 1111(a).

Scheetz and Labuwi contend that the district court erred when it applied USSG § 2D1.1(d)(1) to them because the killing of Locklear was not a murder as defined in 18 U.S.C. § 1111. This argument is without merit.

In reviewing the district court's application of USSG § 2D1.1(d)(1), we review the district court's legal determinations *de novo* and its findings of fact for clear error. *United States v. Dawkins*, 202 F.3d 711, 714 (4th Cir.), *cert. denied*, 529 U.S. 1121 (2000).

Because 18 U.S.C. § 1111 covers crimes committed within the territorial jurisdiction of the United States and because there is no federal burglary statute, 18 U.S.C. § 13 assimilates the North Carolina state law of burglary. Under North Carolina state law, a burglary is defined under the common law. N.C. Gen. Stat. § 14-51. The com-

---

[3]The first-degree murder Sentencing Guideline, USSG § 2A1.1, sets a base offense level of forty-three, resulting in a presumptive life sentence in all cases. USSG Ch.5, Pt. A (sentencing table).

mon law of North Carolina defines burglary as the breaking and entering into an occupied dwelling in the nighttime with the intent to commit a felony therein. *State v. Parker*, 516 S.E.2d 106, 117 (N.C. 1999), *cert. denied*, 528 U.S. 1084 (2000).

In this case, Scheetz and Labuwi's forced entry at night into the residence occupied by Locklear and Lester constituted a burglary under North Carolina state common law because they broke into the occupied residence at night with the intent to commit felonies therein, namely, the assault and robbery of Michael Hagins. Because the killing of Locklear was committed during the perpetration of a burglary, had the killing taken place within the territorial or maritime jurisdiction of the United States, it would have constituted a murder under 18 U.S.C. § 1111. Thus, the district court did not err in applying USSG § 2D1.1(d)(1) because the killing of Locklear constituted a violation of 18 U.S.C. § 1111, which violation was committed during and in furtherance of the conspiracy charged in count one.

## VI

As noted earlier, count one charged Labuwi with conspiracy to distribute and to possess with the intent to distribute in excess of 1,000 kilograms of marijuana and in excess of twenty kilograms of Ecstasy in violation of 21 U.S.C. §§ 841(a)(1) and 846. Labuwi proceeded to trial, but, before the government rested, he withdrew his plea of not guilty and entered a plea of guilty on counts one and three.

During the plea colloquy, Labuwi acknowledged that: (1) he had discussed with his counsel the charges in the indictment to which he intended to plead guilty; (2) he understood the charges to which he intended to plead guilty; (3) the government would have to prove the charges in counts one and three by competent evidence beyond a reasonable doubt; (3) he understood the district court's explanation of the maximum penalties he faced, which included a life sentence on count one; (4) he had discussed with his counsel the applicability and impact of the Sentencing Guidelines on his case; and (5) no promise induced him to plead guilty. When asked if he conspired and agreed with others to distribute and to possess with the intent to distribute marijuana and Ecstasy, "as alleged in count one," (J.A. 1453), counsel for Labuwi informed the district court that Labuwi "admits that he is

guilty of the conspiracy. As far as the Ecstasy, it's his position that he didn't conspire in the Ecstasy but he understands that could be used in the Guidelines range if the government proves it by a preponderance of the evidence." (J.A. 1453-54). In response, the district court asked Labuwi if had conspired to possess and to distribute marijuana to which Labuwi responded that he had so conspired. The district court further inquired of Labuwi if he was "in fact" guilty of counts one and three to which Labuwi responded in the affirmative. (J.A. 1454). The district court then concluded:

> Since you advise that you are, in fact, guilty as charged in count[s] one and three, and since you know your right to trial, what the maximum possibility of punishment is, since you are voluntarily pleading guilty, the court will conditionally accept your guilty plea and enter a judgment of guilty.

> Therefore, let the record reflect the court is satisfied and finds as a fact the plea was freely and voluntarily entered by the defendant. At the time it was entered, the defendant had a full and complete understanding of the charges and maximum penalties provided by law, and the plea is supported by an independent basis in fact containing each essential element of the offense.

> The plea is conditionally accepted. He's adjudged guilty.

(J.A. 1454-55). At sentencing, the district court rejected Labuwi's contention that he pled guilty to being a part of a conspiracy that involved less than 1,000 kilograms of marijuana.

Labuwi contends that, even though he pled guilty to count one, which, under 21 U.S.C. § 841(b)(1)(A), carried the penalty of ten years to life, he should not have been sentenced within that range because he did not plead guilty to a conspiracy to distribute and to possess with the intent to distribute in excess of 1,000 kilograms of marijuana, but rather he pled guilty to being involved in a conspiracy to distribute and to possess with the intent to distribute an unspecified amount of marijuana, and, therefore, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), he could only be sentenced to a maximum sen-

tence of twenty years under 21 U.S.C. § 841(b)(1)(C). Labuwi's argument is disingenuous.

Under *Apprendi*, the government was required to charge the drug quantity of 1,000 kilograms of marijuana in the indictment and to prove that amount beyond a reasonable doubt in order for the district court to impose the enhanced penalties (ten years to life) under 21 U.S.C. § 841(b)(1)(A). As alleged in the indictment, the marijuana portion of the conspiracy involved in excess of 1,000 kilograms of marijuana. Because Labuwi pled guilty to being involved in a conspiracy "as alleged in count one," (J.A. 1453) and acknowledged that he was "in fact" guilty of counts one and three, (J.A. 1454), the conspiracy to which Labuwi pled guilty involved a conspiracy to distribute and to possess with the intent to distribute in excess of 1,000 kilograms of marijuana. To be sure, Labuwi acknowledged during the plea colloquy that the maximum sentence for count one was life, which is the maximum sentence for a drug offense involving at least 1,000 kilograms of marijuana, 21 U.S.C. § 841(b)(1)(A). If Labuwi had intended to plead guilty to being involved in a conspiracy to distribute and to possess with the intent to distribute an unspecified amount of marijuana, or one that involved less than 1,000 kilograms of marijuana, the district court would have advised Labuwi that the maximum sentence for such an offense was less than life, for example, forty years, *id.* § 841(b)(1)(B) (100 kilograms or more of marijuana), twenty years, *id.* § 841(b)(1)(C) (fifty kilograms or more but less than 100 kilograms of marijuana), or five years, *id.* § 841(b)(1)(D) (less than fifty kilograms of marijuana); *however*, the district court correctly did not so advise Labuwi.

In accepting Labuwi's guilty plea to count one, the district court had the authority and in the end the responsibility to determine whether there was a sufficient factual basis to support the charge that Labuwi was a member of the conspiracy that distributed in excess of 1,000 kilograms of marijuana. The district court made this finding not only when Labuwi pled guilty but also at the sentencing hearing. We are satisfied that Labuwi fully understood the nature of the charges to which he was pleading guilty and that there was a sufficient factual basis for the district court to conclude that Labuwi was guilty of conspiring to distribute and to possess with the intent to distribute in excess of 1,000 kilograms of marijuana, *id.* § 841(b)(1)(A).

VII

Scott Brooks was convicted under count one of conspiracy to distribute and to possess with the intent to distribute less than fifty kilograms of marijuana, an offense carrying a statutory maximum of five years, *id.* § 841(b)(1)(D). Scott Brooks was convicted under count three of using or carrying a firearm during and in relation to the count one conspiracy, but was acquitted of discharging that firearm. Scott Brooks's conviction on count three carried a statutory minimum of five years and a statutory maximum of life. In Scott Brooks's presentence report (PSR), the probation officer found Scott Brooks's Sentencing Guidelines range for count one to be sixty months because the Sentencing Guidelines minimum for count one as calculated by application of USSG § 2D.1(d)(1) (life) exceeded the statutory maximum sentence for Scott Brooks's conviction on count one (sixty months), *id.* § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."). With regard to count three, the probation officer found Scott Brooks's Sentencing Guidelines range to be sixty months, *id.* § 2K2.4(a)(2) ("If the defendant . . . was convicted of violating . . . Section 924(c) . . ., the guideline sentence is the minimum term of imprisonment required by statute.").

Prior to sentencing, the government moved for an upward departure on Scott Brooks's count three sentence. In its motion, the government cited two grounds for an upward departure: (1) the death of Locklear under USSG § 5K2.1; and (2) the physical injury to Floyd under USSG § 5K2.2. The district court agreed to upwardly depart on Brooks's count three sentence, principally relying on the death of Locklear and the physical injury to Floyd in arriving at its decision to impose a 322-month sentence (sixty months on count one, 262 consecutive months on count three):

> The last, and by far most significant, aggravating factor is the defendant's participation in the murder of Marcus Locklear and the shooting of Ronald Floyd on April 11, 2000. As noted in the presentence report, the cross-reference at Section 2D1.1(d)(1) and the application of Section 2A1.1(a) direct that the appropriate offense level for

this conduct is 43, which under any Criminal History Category requires life imprisonment. While the court finds the total unpunished aggravating conduct compelling, the court does not find that an upward departure to life imprisonment, as has been suggested by guideline calculations, would be appropriate. This finding is based primarily on the defendant's subservient role to Timothy Scheetz, and on the fact that the defendant did not contemplate that Locklear was to be murdered. Therefore, beginning at an offense level of 43 as established in the presentence report, the court will deduct 4 offense levels comparable to the Role Adjustment at Section 3B1.2(a). The court recognizes that the defendant did not fit the description of minimal participant as provided in the Commentary to Section 3B1.2; however, the court also recognizes that an offense level of 43 is the highest level allowed by the guidelines and feels that a 4 level reduction is necessary to ensure adequate consideration of the defendant's lower level of culpability. With this reduction, and in view of the defendant's criminal history category of I, an offense level of 39 and an imprisonment range of 262-327 months results. Considering the mandatory consecutive 5 year term required in Count 3, the court views the bottom of this range, which results in a total term of imprisonment of 322 months, as appropriate punishment.

(J.A. 1821).

A sentencing court may depart and "impose a sentence outside the range established by the applicable guidelines, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into account by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" USSG § 5K2.0 (quoting 18 U.S.C. § 3553(b)). With the exception of a few factors that the Sentencing Guidelines specifically note may not be considered as grounds for departures by the sentencing court, the Sentencing Guidelines do not limit "'the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case.'" *Koon v. United States*, 518 U.S. 81, 93 (1996) (quoting USSG Ch. 1, Pt. A, intro. comment. 4(b)). How-

ever, because the Sentencing Guidelines were established to create, *inter alia*, uniformity and regularity in the sentencing of similarly situated defendants, "[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline." *Koon*, 518 U.S. at 98. This is often referred to as the heartland theory for departures. USSG Ch. 1, Pt. A, intro. comment. 4(b), *id.* § 5K2.0.

Our decision in *United States v. Rybicki*, 96 F.3d 754 (4th Cir. 1996), established a five-step analysis to be used by district courts in deciding whether to depart from an applicable Sentencing Guideline. First, a district court must determine the circumstances and consequences of the offense, which determination we review only for clear error. *Id.* at 757. The district court found that Scott Brooks played a significant role in the murder of Locklear and the shooting of Floyd, and we cannot conclude that this finding is clearly erroneous. Second, the district court must decide whether any of the circumstances and consequences appear "'atypical'" enough to potentially take the case out of the applicable Sentencing Guideline's heartland. *Id.* The district court identified several factors, but ultimately relied on the murder of Locklear and the shooting of Floyd as "atypical" factors, and we do not review the district court's identification of these factors. *Id.* Third, the district court must classify each factor that could potentially remove a case from the applicable Sentencing Guideline as either: (1) a "forbidden" basis for departure; (2) an "encouraged" basis for departure; (3) a "discouraged" basis for departure; or (4) an "unmentioned" basis for departure. *Id.* We review *de novo* this classification by the district court. *Id.* at 758. The death of Locklear and the shooting of Floyd both are encouraged factors. USSG § 5K2.1 (death), *id.* § 5K2.2 (physical injury). Fourth, the district court (assuming, as here, that it determined in step three that the two aforementioned factors are encouraged ones for departure) must determine whether the Sentencing Guidelines have already accounted for the factor. If the Sentencing Guidelines have not already taken the factor into account, and if the factor is encouraged, the factor is usually an appropriate one for departure. *Koon*, 518 U.S. at 94-95. We review *de novo* the determination of whether an applicable Sentencing Guideline already takes a particular factor into account. *Rybicki*, 96 F.3d at 758. The Sentencing Guideline for possession of a firearm during and in relation to a drug trafficking offense, USSG

§ 2K2.4(a)(2), does not take into account that death or physical injury may be a reasonably foreseeable result from the commission of the 18 U.S.C. § 924(c) offense. We see nothing in the text of USSG § 2K2.4(a)(2), and Scott Brooks points to nothing in USSG § 2K2.4(a)(2), that would require us to disturb this conclusion. Section 2K2.4(a)(2) provides that the Sentencing Guidelines sentence for a violation of 18 U.S.C. § 924(c) "is the minimum term of imprisonment required by statute," USSG § 2K2.4(a)(2), but nothing in USSG § 2K2.4(a)(2) provides an adjustment for death or physical injury where the death or physical injury is a reasonably foreseeable result from the commission of the 18 U.S.C. § 924(c) offense. The fifth and final step in the *Rybicki* analysis requires the district court to decide whether a departure, based on these appropriately classified factors, is, in fact, warranted and reasonable under the circumstances. 96 F.3d at 758; *see also United States v. Terry*, 142 F.3d 702, 707 (4th Cir. 1998). We review the ultimate departure decision for abuse of discretion, and any factual determinations underlying this decision for clear error. *Rybicki*, 96 F.3d at 758.

We find no abuse of discretion in the district court's decision to depart upward from a sixty-month sentence on count three to a sentence of 262 months. We agree with the district court that Scott Brooks's culpability in the death of Locklear and the physical injury of Floyd is at the low end of the spectrum, in that Scott Brooks was an indirect cause of these injuries, but we cannot conclude that Scott Brooks is outside the scope of USSG § 5K2.1 or USSG § 5K2.2. Unintended consequences are often the result of reckless behavior, and while perhaps Scott Brooks could not have anticipated the particular sequence of events, Scott Brooks should have foreseen the possibility of serious physical harm to another as a result of his actions. We see no basis for foreclosing a departure under USSG § 5K2.1 or USSG § 5K2.2 when a defendant helps put into motion a chain of events that risks serious injury or death, even when an intent to harm is entirely absent and the defendant was not directly responsible for the death. *Cf. United States v. Diaz*, 285 F.3d 92, 100-01 (1st Cir. 2002) (holding that, in a 18 U.S.C. § 922(g)(1) prosecution, USSG § 5K2.1 upward departure was warranted because the defendant "should have foreseen the possibility of serious harm" as a result of his actions, even though the defendant harbored no intent to harm and was not directly responsible for the death); *United States v. Fortier*,

242 F.3d 1224, 1232-33 (10th Cir. 2001) (holding that an increased sentence may be imposed for harms that were a reasonably foreseeable consequence of the defendant's conduct even where the defendant did not directly cause the specific harm). Furthermore, the extent of the departure was eminently reasonable. Scott Brooks's participation in the death of Locklear amounted to conduct that put him within the scope of the most analogous Sentencing Guideline related to his conduct, the first-degree murder Sentencing Guideline under USSG § 2A1.1, resulting in an offense level of forty-three. The district court understandably reduced Scott Brooks's offense level by four levels for his less culpable role in the death of Locklear. Consequently, we see no abuse of discretion in the district court's decision to sentence Scott Brooks on count three to 262 months' imprisonment.

## VIII

For the reasons stated herein, the judgments of the district court are affirmed.

*AFFIRMED*